[See Case No. 16,990.]

## Case No. 8,261.

### LEONARD et al. v. WHITWILL.

[10 Ben. 638; 14 Am. Law Rev. 164.] [1]

District Court, S. D. New York. Nov., 1879.

COLLISION AT SEA—BRITISH STEAMER AND AMERICAN SCHOONER—FOG—SPEED—TORCHLIGHT—LAW OF THE SEA—APPORTIONING DAMAGES WHERE BOTH VESSELS ARE IN FAULT—CARGO—PARTIES.

1. A schooner belonging to citizens of the United States was sunk and totally lost with her cargo in a collision with a steamer belonging to a citizen of Great Britain. at sea, off the east end of Long Island, on the night of April 17th, 1877. The wind was from the E. S. E., about a two and a half to three knot breeze, and the schooner was on the starboard tack heading N. E. by E. The steamer had been running on a course E. by S. ½ S. from the lightship off Sandy Hook, at a speed of about seven knots an hour. There was a dense fog at the time of the collision, which shortly afterwards cleared up. A fog horn was being blown on the schooner and continued to be blown after the whistle of the steamer was heard, and her course was kept till the instant of collision. Her lights were set, but the steamer was approaching her at such an angle that they were not visible, and she showed no torchlight. The second mate of the steamer was on her bridge in charge of her navigation. The sound of the fog horn of the schooner was heard on the starboard bow of the steamer, her engine was at once slowed and her helm put hard-a-starboard. The captain was also signalled to come to the bridge, and. as soon as he came. he ordered the engines to be stopped and reversed. The lookouts and the officers on the bridge kept a sharp lookout for the vessel whose horn they heard, but they could not see the schooner till she was close under the steamer's bows. The headway of the steamer was almost stopped at the time of the collision. but she struck the schooner on her port side about forty feet from her stern, and the schooner, which was loaded with coal. shortly afterwards sank. The owners of the schooner filed a libel against the owner of the steamer to recover for the loss of the schooner, her freight and her cargo: Held, that the schooner having kept her course, it was the duty of the steamer to have kept out of her way.

2. Under the circumstances of the density of the fog, in which the steamer was navigating. and the liability, in that part of the ocean, to fall in with vessels. the speed of the steamer was not a moderate speed, as she was not under such control that she could be stopped in time to prevent a collision with such vessels as she might expect to meet.

[Cited in The Nacoochee, 22 Fed. 857; The Fulda. 52 Fed. 401.]

3. The starboarding of the steamer's helm was proper. but she was in fault in not stopping immediately upon hearing the fog horn.

[Cited in The State of Alabama, 17 Fed. 856; The Normandie, 43 Fed. 157.]

4. The schooner was in fault for her failure to show a torch light on hearing the steamer's whistle, as required by the act of congress of 1871 (16 Stat. 459. now section 4234 of the Revised Statutes). and the facts that the steamer was a British vessel and the collision was on the high seas, did not prevent the respondent from setting up such failure as fault in this action.

[Cited in The City of Merida, 24 Fed. 233.]

5. Whether, independent of the statute, it would have been a fault under the general mari-

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict. Esq.. and here reprinted by permission. 14 Am. Law Rev. 164, contains only a partial report.]

time law, that the schooner failed to exhibit a torch under these circumstances, quaere.

6. The schooner being in fault in not having shown a torch, it became necessary for her to show that such fault had not contributed to the collision, and that she had failed to do so.

7. Both vessels being in fault, the damages must be apportioned. The owner of each vessel must bear half of the loss: and the owners of the schooner must bear half of the loss of the cargo and of the seamen's effects; and the decree should be that the whole damages caused by the collision be apportioned between the parties.

[Cited in Duncan v. The C. H. Foster, 1 Fed. 734; The Nahor, 9 Fed. 214; The Canima, 17 Fed. 272; The Hercules, 20 Fed. 206; The Bristol, 29 Fed. 875; The Queen, 40 Fed. 695.]

8. It was unnecessary to make the owners of the cargo of the schooner parties to the suit, they being already virtually before the court through the libellants, the owners of the schooner.

[Cited in Atlantic Mut. Ins. Co. v. Alexandre, 16 Fed. 282; The Wm. Murtagh, 17 Fed. 263.]

[This was a libel in admiralty by Job M. Leonard and others against Mark Whitwill to recover damages for losses sustained by collision.]

Henry M. Scudder and George A. Black, for libellants.

R. D. Benedict and James Thomson, for respondent.

CHOATE, District Judge. This is a suit in personam brought by the owners of the American schooner J. M. Leonard of Fall River, and her master and crew, against the owner of the British steamship Arragon, to recover the value of said schooner and her cargo and freight, and the personal effects of the master and crew, alleged to have been totally lost in consequence of a collision between the schooner and the steamship on the 17th of April, 1877, the total value as stated in the libel being $30,686.25. The schooner, which was of 408 tons register, was bound on a voyage from Philadelphia to Providence, R. I., with a cargo of 549 tons of coal. The steamship, a propeller of 837 tons register, was bound on a voyage from the port of New York to the port of Bristol, England. The collision happened a few minutes after eight o'clock in the evening. The libel puts the place of the collision "in the Atlantic ocean, off the eastern end of Long Island and distant about fifteen miles therefrom." The answer denies this and avers that it was "about fifty-one miles east from Sandy Hook and south of the Long Island shore between Fire Island light and Shinnecock light and about eighteen or twenty miles southeast by east of Fire Island light." This question of the place of the collision is chiefly important, if at all, as bearing on the question of the speed at which the steamer was running. It is admitted by the pleadings that the schooner was heading N. E. by E. on her starboard tack, the wind being E. S. E. The schooner was sailing by the wind with all sail set except the main-top sail

and mizzen stay sail, which had been furled upon the setting in of the fog about two hours before. The wind was light but steady. The parties do not differ substantially as to its force. Those on the steamer estimated it to be a 2½ to 3 knot breeze, and the mate of the schooner, the officer of the deck at the time of the collision, at about 2½ knots. Prior to any change by reason of hearing the fog horn of the schooner, the steamer had kept a true east course from the light-ship; by her compass, as testified to by her master, E. by S. ½ S. A fog set in soon after six o'clock which grew quite dense and continued till a few minutes after the collision, when it cleared up. How dense this fog was and how far it obscured the sight of objects on the water and lights at the time of the collision, is a question seriously contested in the case. Before the collision the fog horn of the schooner was heard on the steamer once only, a little on the starboard bow, and, in consequence thereof, the wheel was starboarded and the engine slowed and afterwards stopped and reversed. Before the collision the whistle of the steamer was heard on the schooner, and her masthead and starboard lights were seen, and after the whistle was heard the fog horn of the schooner was several times blown. It is conceded that the schooner kept her course till the instant of collision. Of course it was the duty of the steamer to keep out of the way of the schooner and, prima facie, the responsibility for the collision rests on the steamer. Each party, however, charges the other with faults as causing or contributing to cause the disaster.

The libel charges against the steamer "that the collision occurred solely through the negligence and want of care and improper conduct of those in charge of said steamer Arragon, in that the said steamer was run at a dangerous and excessive speed in said fog, and was improperly and carelessly navigated, and without sounding her whistle at proper intervals, and no sufficient lookout was kept on said steamer, nor proper measures taken to avoid said collision by stopping and backing the said steamer, or avoiding the said schooner." The answer, after denying all these alleged faults or acts of negligence and alleging that so far as the steamer was concerned, the collision was the result of unavoidable accident, charges against the schooner that "she was short handed and over laden, and that when the whistle of said steamer was heard by those on board of said schooner it was their duty immediately to have shown a lighted torch upon the part of said schooner towards which the said steamer was approaching; that as the vessels were approaching each other the side light of the said schooner could not be seen from the steamer before the collision, nor could said schooner herself be seen until she was within a few feet of the steamer; that if said torch had been so exhibited it would have been visible to those on board of said steamer, even before

the said fog horn was heard, and would have shown to them that said schooner was crossing the bows of said steamer from starboard to port, and would have been seen in time so that said steamer's helm could have been ported and her head swung off to starboard, or her swing to port under the starboarding of her helm could have been stopped so that the vessels would have gone clear of each other."

It is very evident from the testimony that at the time the vessels came together the headway of the steamer was nearly stopped. Although, as she approached, she seemed to those on the schooner to be moving rapidly, yet the most satisfactory evidence on this point is the effect of the blow on the schooner. The schooner was passing the steamer's bow nearly at right angles and the stem of the steamer struck the schooner just forward of the mizzen rigging, yet did not strike with force enough to sink her instantly or cut her in two as has happened in some collisions. The steamer seemed to those on the schooner to strike more than once. The vessels brushed by each other, the steamer passing under the schooner's stern as the schooner, still moving forward, came up before the wind on the port side of the steamer after she was struck. The man at the wheel of the schooner remained at his post till the collision. He observed that the blow slewed the schooner so that she headed N. E. ½ E. thus changing her heading a half point to the northward. Most of the crew of the schooner got into her boat which was hanging at the davits. They had time to get into the boat and get her in the water and pull a little way off before she sank. They had no time to save anything. It appears also that the steamer did not get far off from the schooner, and after the collision the schooner was lying on her port quarter a little astern of her. These circumstances show, I think, that while the blow was enough to crush in her port side, so that she rapidly filled with water, it was not delivered with any great velocity. Both vessels were shown to have their side lights properly placed and brightly burning. On the schooner it had struck eight bells when the whistle of the steamer was heard, but the watch had not been changed. It had been the mate's watch and he was still on deck on duty. There was a lookout forward who had charge of the fog horn and there was an able seaman at the wheel. Before the collision the rest of the crew got on deck.

On the steamer it had been the second mate's watch from six to eight o'clock and he was still on the bridge up to the time of the collision. The captain had been with him until a few minutes before eight o'clock, when he went below, but was recalled by a signal by whistle before the collision, given after the fog horn of the schooner was reported, and he returned to the bridge and took charge of the movements of the vessel before the collision. The lookout forward in the second mate's watch had been relieved by the new lookout before the fog horn was reported, but they were both forward, close to the stem, up to the time of the collision. There was, also, a man stationed as lookout just forward of the bridge, on the deck. He was on his station when the fog horn was reported and remained on duty till after the collision. There had been one man at the wheel, and the wheelsman of the mate's watch had come into the wheelhouse before the collision, and both had hold of the wheel and handled it in executing the orders given after the report of the fog horn. The engineer was at his post. There were two other men on deck who were called as witnesses.

The first and chief fault imputed to the steamer is that she was running at an excessive rate of speed. The answer alleges that "when the fog set in, two hours previously, the rate of speed of the steamer was slowed down to about six knots an hour, and so continued till the fog horn of the schooner was heard, and when the steamer's company heard the fog horn of the schooner her engines were immediately slowed and stopped and reversed at full speed, and when she collided with the schooner her speed had become so reduced that she had but a very slight forward motion and had almost stopped." The libel does not charge any particular speed but "great" speed, "dangerous and excessive speed in said fog." The answer gives an erroneous impression as to the course of events on the steamer after the hearing of the fog horn. It seems to imply, or might be taken to mean, that the orders to slow, to stop and to reverse, followed each other in immediate succession upon the hearing of the fog horn. It is very evident, however, upon the steamer's proofs, that this was not so; that the order to slow was first given, and afterwards, at an interval of time not exactly fixed, the other orders to stop and reverse at full speed were given in immediate succession.

(The court here set forth at length the evidence as to the speed of the steamer, and then proceeded as follows:) The actual speed of the steamer must therefore be taken to be upwards of seven knots an hour through the fog. To determine whether this exceeded that "moderate" speed, which the laws of England and the United States alike prescribe as the speed of a steamer during a fog, requires a consideration of the circumstances under which she was proceeding, and especially the density of the fog, and the place where she was sailing as respects her liability to fall in with other vessels. (After setting forth the evidence given by the witnesses from the two vessels as to the density of the fog, and the time and distance at which each was seen from the other, the court proceeded as follows:) There is here, apparently, a serious conflict of evidence as to the character and density of the

fog. Making all due allowances for mis-judgment as to time and distance, it is still evident from the concurring testimony of those on the schooner that, at the time the steamer's whistle was heard, the schooner was not in a very dense fog, and that the steamer's lights were seen from the schooner much further off than would be deemed possible from the testimony of those on the steamer. I think the testimony shows clearly that at no time before the collision did the port light of the schooner come within sight of those on the steamer. This not only appears from the fact that although so many men were looking out for the purpose of discovering the vessel on the starboard bow, yet they did not see this light, but also from the proved relative courses and positions of the two vessels. The testimony of those on the steamer on this point is rendered very probable, notwithstanding the estimate of those on the schooner as to the bearing of the steamer when first seen as nearly abeam, and possibly so little aft of abeam as to have brought the port light within range. This is their judgment only, about which they may easily have been mistaken. The light which the lookouts on the steamer saw when the schooner was close on to them may have been, upon the proofs, the binnacle light, which is shown to have been on the weather side of the compass and inside the house. There is no reason to believe that this would become visible to any one on the forward deck of the steamer till they could look down on the deck of the schooner. In considering this apparent conflict of testimony, therefore, it must be remembered that up to about the time of the collision it had been very thick, and that while those on the schooner had the lights of the steamer within range of their vision to aid their judgment just at that time as to the density of the fog, those on the steamer had no such assistance to aid their observation. It appears, also, from the testimony, to be probable that just at that time the fog was clearing up rapidly to windward, and the schooner being all the time to windward of the steamer, it was clearing about her more rapidly than about the steamer. The witnesses of the schooner had already observed that it was clearing up before they heard the steamer's whistle. But so far as those in charge of the steamer were concerned, they had not observed this, even if immediately about the steamer the fog had become any less dense. The place in which the steamer was sailing was a part of the ocean constantly traversed by vessels bound in and out of New York and coastwise.

Under these circumstances I have no hesitation in holding that the speed of the steamer, as proved, or even that admitted in the answer, was much in excess of a "moderate speed." The prudence or imprudence of those navigating her is to be judged by what they knew or observed as to the density of the fog and not by what possibly they might have known or observed, if in consequence of seeing lights in the direction of the schooner they might have had more exact means of observation. For an hour and a half they had been running through a dense fog in a much frequented highway of commerce at a speed exceeding seven knots, and when they heard the fog horn of the schooner they were still doing the same thing, without the fog having cleared at all, so far as they could see. They were liable at any moment to fall in with other vessels, either bound out of New York or coastwise northward, in which case, as the wind was, they were likely to cross the bows of the steamer as this schooner did, or bound inward before the wind, in which case they might come in a nearly opposite direction to her course. The master of the schooner was, by his own reckoning, about sixty-five miles east of Sandy Hook, instead of about 51 as shown by the log of the steamer. I do not perceive that it makes any difference as regards the prudence of the steamer's speed which is right. In either place the speed was excessive and dangerous, and the steamer was not under such control that she could be stopped in time to prevent a collision with such vessels as she might expect to meet. The case is not to be judged by the fact that as it was she nearly stopped in time to avoid this vessel. It was the good luck of the steamer and not the result of her prudence that the schooner was not much nearer when first discovered, and that she was going upon a course which involved little risk to the steamer from the collision. The case is to be judged on this point, not by what did happen, but by what might reasonably have been expected to happen. The Pennsylvania, 19 Wall. [86 U. S.] 125. See also the Eleonora [Case No. 4,335].

I think, also, that the steamer was in fault for not immediately stopping upon hearing the fog horn a little off her starboard bow. The order given by the mate was "half speed." At the same time he gave the order to put the wheel hard-a-starboard. This order to starboard seems to have been proper. It turned the vessel's head away from the direction in which the other vessel was. It tended to reduce the chances of collision. But in the absence of all knowledge as to the direction in which the other vessel was moving, and especially considering that the steamer was already running at a dangerous rate of speed, it was manifestly the duty of her officer in command to reduce that excessive rate in the quickest possible time. Even if he was justified in holding her at some speed, the least compatible with the control of her movements, he was bound to reduce her to that limit at once. This he did not do. Having given these orders he signalled the captain to return to the bridge, and told him the situation. The captain instantly gave the orders to stop and reverse

at full speed, but it was already too late. She was not quite stopped before reaching the schooner. Although the interval between the orders by the mate and those given by the captain was very short, it undoubtedly, on the testimony, was long enough to make such a difference in the distance traversed by her that, if the order to stop and reverse had been given at once, she would not have struck the schooner. But without regard to that fact, which could only be known by the event, the situation at the time the horn was heard called for an instant and most rapid possible reduction of her immoderate speed. This the captain seems to have realized when he reached the bridge. He did then what the mate should have done before.

It remains to consider whether the schooner is also in fault. The fault charged is that she did not show a torchlight to the approaching steamer. It is admitted that she did not show a torch, but it is insisted that she was under no obligation to do so, so far as this steamer was concerned, because the steamer was a foreign vessel, to which the navigation laws of the United States do not apply and on which they are not binding. And it is further contended, that if she had shown a torch there was nothing that the steamer could have done after she could have seen it to have avoided the collision already made inevitable by her own imprudence. By an act of congress, passed in 1871 [16 Stat. 440], it was enacted that "every such" (i. e., sailing) "vessel shall, on the approach of every steamer during the night time, show a lighted torch upon that point or quarter to which such steamer shall be approaching. And every such vessel that shall be navigated without complying with the terms of said act of April 29, 1864 [13 Stat. 58], and the provisions of this section, shall forfeit and pay the sum of two hundred dollars," etc. It is claimed on the part of the libellants that the law which governs the case of a collision between an American and a foreign vessel is the general maritime law, or "those rules of navigation which usually prevail among nations navigating the seas where the collision takes place;" that a foreign vessel cannot attribute as a fault against an American vessel the violation of an act of congress unless the requirement of that law has become a part of the general maritime law or rule of the sea, which it is insisted is not the case in respect to this statute regulation. So far as appears by evidence in this case, no other maritime nation has made this regulation, as to showing a torch-light, a part of its positive statutory regulations for preventing collisions. The rule of law here invoked on the schooner's behalf, is undoubtedly the rule of the English court in respect to their own navigation laws. It was first applied by the court of admiralty, and has received the assent of the privy council. The Dumfries,

Swab. 63; The Zollverein, Id. 96; The Chancellor, 4 L. T. (N. S.) 627; The Saxonia, 1 Lush. 410. In the case of The Belle [Case No. 1,269], Judge Shipman, in this court, upon the authority of the first three of these cases, directly applied the same principle in exoneration of a British vessel sued here by the owners of an American vessel, with which she was in collision, refusing to find it as an act of negligence against the British vessel that she had failed to comply with the positive requirement of the British statute in respect to lights; that requirement not being then a part of the maritime law generally nor enacted by our congress. It is to be observed, however, that in that case the judge expressly found that "there was no proof whatever, that the failure to carry the colored lights prescribed by the British act, misled the Belle or in any way contributed to produce the disaster." In the case of The Scotia [Id. 12,513], in this court, these English cases were approved. The question was whether the Scotia being sued here by the owners of the Berkshire, an American vessel, could impute it as a fault to the Berkshire that she had failed to comply with the act of congress prescribing the lights to be carried by American vessels. The collision was attributable to the Berkshire's carrying no colored side lights and showing a white light, at such a height that the Scotia mistook her for a steamer, at much greater distance off than she really was. The case was decided by the district court in favor of the Scotia, on the ground that the establishment of the same regulations as to lights by a very large number of maritime nations, including Great Britain and the United States, showed that this regulation as to lights had become part of the general maritime law in force in that part of the sea where the collision occurred. The case was appealed and the circuit judge, while concurring in the decision, on the ground that whether the Berkshire was bound to observe these rules or not, she was alone at fault and the Scotia was not at fault, distinctly disapproved of the rule of the English cases cited above, on the ground that these regulations for preventing collisions and for the security of life and property, were designed to be observed at all times and in all places by American vessels; that they were designed for the benefit of all mankind in securing the greater safety of life and property at sea; that at any rate they were designed to secure greater safety of life and property on our own vessels, and that therefore public policy requires that they should be always enforced in our own courts. The case then went to the supreme court [14 Wall. (81 U. S.) 170], and the decisions below were affirmed. Mr. Justice Strong, in delivering the opinion of the court, while he seems to put the decision of the case on the ground that in any view of this question the merits were wholly with

the Scotia, yet, as it seems to me, strongly disapproves the rule established by the English cases cited above. He says: "We rest this conclusion, not solely or mainly upon the ground that the navigation laws of the United States control the conduct of foreign vessels, or that they have as such any extra-territorial authority except over American shipping. Doubtless they are municipal regulations, yet binding upon American vessels, either in American waters or upon the high seas." "We concede, also, that whether an act is tortious or not, must generally be determined by the laws of the place where the act was committed. But every American vessel, outside of the jurisdiction of a foreign power, is for some purposes, at least, a part of the American territory, and our laws are the rules for its guidance. Equally true is it that a British vessel is controlled by British rules of navigation. If it were that the rules of the two nations conflicted, which would the British vessel and which would the American be bound to obey? Undoubtedly the rule prescribed by the government to which it belonged. And if in consequence collision should ensue between an American and a British vessel, shall the latter be condemned in an American court of admiralty? If so, then our law is given an extra-territorial effect and is held obligatory upon British ships not within our jurisdiction. Or might an American vessel be faulted in a British court of admiralty for having done what our statute required? Then Britain is truly, not only the mistress of the seas, but of all who traverse the great waters. It is difficult to see how a ship can be condemned for doing that which, by the laws of its origin or ownership, it was required to do, or how, on the other hand, it can secure an advantage by violation of those laws unless it is beyond their domain upon the high seas. But our navigation laws were intended to secure the safety of life and property as well as the convenience of commerce. They are not in terms confined to the regulation of shipping in our own waters. They attempt to govern a business that is conducted on every sea. If they do not reach the conduct of mariners in its relation to the ships and people of other nations, they are at least designed for the security of the lives and property of our own people. For that purpose they are as useful and necessary on the ocean as they are upon inland waters. How, then, can our courts ignore them in any case? Why should it ever be held that what is a wrong when done to an American citizen is right if the injured party be an Englishman?" In this state of the authorities I do not think that the English cases cited or the former decisions in this court, both of which, it will be observed, were rested partly on other and independent grounds, are in any way controlling. And I do not perceive that the cases cited by the libellants, with regard to the construction put upon the English act limiting the liability of ship owners, have any pertinency to this question. They proceed simply on the ground that that act by its terms is to be construed as intended to be limited to British ships. This appears very plainly in the opinion of Vice-Chancellor Wood in Cope v. Doherty, 4 Kay & J. 367. The cases of The Dumfries, The Zollverein, and The Saxonia, proceed not on the principle that a British ship on the high seas is in general absolved from its obligation towards its own government and her subjects to obey the British navigation laws but upon the ground that this is a duty only to her own government and its subjects, and not to foreigners; that the laws were not passed for the benefit of foreigners and are not binding on them, and that it is inequitable to enforce the rules against a British ship in favor of a foreign ship, because if the case were reversed and the foreign ship had committed the same fault, not being a fault by the general maritime law, the British ship could not avail herself of it as a fault against the foreign ship; that this would be to put the British vessel to a disadvantage in her own courts. It is not to be forgotten that the ground of liability in this class of cases is negligence. If a given act is in violation of a positive regulation of statute law, obligatory upon the party, it is, as a general rule, conclusively negligent, and if it may have contributed to the injury the burden is thereby thrown on the guilty party to prove that it did not so contribute to the injury. This is the American as well as the English rule. The Pennsylvania, 19 Wall. [86 U. S.] 137. Now, whatever may be the decision ultimately reached in such cases as The Scotia [supra], where the prescribed act omitted was the observance of a mere artificial mode of signalling to other vessels the character of a vessel or her position and course, by an arbitrary arrangement of certain prescribed lights, it seems to me that the failure of an American vessel to comply with the requirement of the act of 1871, in reference to showing a torch, must be held to be an act of negligence on her part, whether the other vessel is domestic or foreign. That statute seems especially designed to protect our own sailing vessels and to save life and property thereon. It is true that a steamer approaching a sailing vessel under circumstances to which the statute applies will be in some danger, and it may well be, and probably is, true, that her protection, whether foreign or domestic, was also within the purview of the act; but it needs no argument to show that the relative positions of the two vessels must generally be of very unequal peril, greatly to the disadvantage of the sailing vessel. The object of the torch is to give the steamer such information as to the position and course of the sailing vessel that she may not run her down. It seems especially, if not solely, ap-

plicable to the case of a sailing vessel approached from astern or on the quarter where her own lights cannot be seen, and to the case of a vessel, in danger of being thus run down by a steamer. Not only is it apparently designed chiefly for the safety of the sailing vessel but the thing required to be done is not the giving of a mere artificial or arbitrary signal, but is simply such a precaution as prudence might in the absence of any regulation suggest, and such a signal as any steamer would understand, whether aware of the regulation or not. Congress can declare what shall be considered negligence in the mode of navigating an American ship under given circumstances, and this is what I think has been done by this statute. Considering the obvious purpose designed to be accomplished by the act, I have no doubt it was intended to be observed by all American vessels everywhere, approached in the night time in the manner described by any steamer, whether domestic or foreign. The peril in either case is the same and the precaution prescribed would be equally effective. I think the case may be distinguished from the case of arbitrary or artificial signals. As to those there is more reason to say that they are inapplicable between ships of different nations, where they have not become part of the language of the sea. They are of doubtful utility unless understood and used by both parties.

I think, therefore, I am bound to hold as an act of negligence the omission of the schooner to comply with the act of 1871 by showing a torch, and it is unnecessary to decide whether, independently of the statute, it would have been required of this schooner by the general maritime law, as contended by the claimant. Under some circumstances the general maritime law does require a vessel to show other lights besides the regulation lights. See especially The Anglo-Indian, 3 Asp. 1; The Earl Spencer, Id. 4.

It is urged that the rule does not apply in foggy weather; that other regulations are especially made for foggy weather. It is a sufficient answer to say, that according to the state of things observable to those in charge of the schooner, lights could be seen a considerable distance, certainly further than objects lying low in the water like the schooner's hull, or even her sails. And I see no reason for excepting foggy weather, be the fog ever so dense. The rules must be complied with. Fogs may break away suddenly, as we see by this instance.

But it is still a question whether the steamer could have taken any precaution after she could have seen the torch for avoiding the schooner. It is impossible to determine that she could not have done so. The schooner was struck about forty feet from the stern. The steamer was, from the time the fog horn was heard, under a hard-a-starboard wheel. Under this wheel her head began to

fall off to port. According to the testimony of the second mate it fell off a point and a half before the captain gave the order to stop and reverse full speed. The effect of backing, even with a hard-a-starboard wheel, was to throw her head the other way. If her wheel had been seasonably thrown to port upon discovering by a torch-light which way the schooner was going, this movement to starboard would have been accelerated so long as she had any headway. The question whether there would have been time for this manoeuvre, depends partly on the question how far off those on the steamer could have seen a torch-light, and partly on the question how much the porting at that time would have changed the steamer's heading to starboard. Unfortunately for the schooner, the elements for determining these two questions are very uncertain and mostly speculative, and her violation of a positive rule, obligatory on her, makes it incumbent on her to produce such evidence as will determine these points with at least reasonable certainty in her favor. I think she has not done so. There was certainly a considerable time before the collision that the lights of the steamer were plainly visible from the schooner. There was time enough for considerable running about, horn-blowing and shouting in the vain endeavor to make those on board the steamer change their course. While it cannot be assumed that a torch-light on the schooner could have been seen on the steamer as soon as the green light of the steamer was seen on the schooner, yet if it had been seen after that time it is still quite possible upon the evidence that the steamer could have reversed her wheel in time to have gone under the stern of the schooner, and the question how far a torch-light could have been seen, must be determined chiefly from the testimony of those on the schooner, since they alone of all the witnesses had any opportunity to form any judgment on that point.

It is claimed that the schooner was negligent in not blowing her horn loud enough or often enough. It is argued that the act of the mate in snatching the horn from the lookout and blowing it himself, shows that he was not satisfied with the way it had been blown. I do not think this is a proper inference from the testimony. It is a singular fact in the case that but one blast of the horn was heard on the steamer, but the evidence is sufficient to prove that it was blown at proper intervals and several times just before the collision.

The result is, that both vessels were in fault, and the libellants will have a decree for half their damages and costs, and a reference to compute the amount of their damages.

An application was subsequently made by the libellants to modify the decree so as to decree that the libellants should recover the

full value of the cargo and of the seamen's effects.

CHOATE, District Judge. It has been determined in this case that both vessels were in fault. The suit is in personam by the owners of the schooner sunk by the collision, against the owner of the steamer. The answer, while alleging the fault on the part of the schooner, which has been found by the court, did not claim any rebate on account of the damage done by the collision to the steamer. It appears, however, by the testimony that the steamer sustained at least slight damage. A question now arises as to the form of the interlocutory decree to be entered. The libellants insist that there should be a decree for half the value of the schooner and the full value of her cargo and of the seamen's effects. It is argued that the steamer is liable to the innocent owner of cargo for its whole value; that as to that part of libellants' claim the libellants sue merely as agents or trustees; that the schooner, being totally lost by the collision, her owners are not, under the statute limiting the liability of ship owners, liable to the owners of the cargo for any part of this damage; that, therefore, the steamer must pay it in full. And the same argument is applied to the claim for the seamen's effects. It is insisted on behalf of the respondent that the loss should be apportioned, and that out of the recovery for the value of their vessel the libellants should pay to the owners of their cargo and to the seamen half of the loss sustained by them. The libellants offer to have the owners of cargo brought in, if necessary, as parties, and the respondent asks leave to amend his answer so as to have the benefit of an apportionment in accordance with his right upon the facts proved.

The prinicple of apportionment, as I understand it, requires, where there is fault on both sides, that the loss or damage caused by the collision should be borne equally by the two parties. Damage done to cargo in either vessel is a part of that loss or damage, and it is wholly immaterial in which vessel the damaged cargo happens to be. It is very true that the owner of the cargo may sue and recover its value from both or either. The Atlas, 93 U. S. 302. And the owners of the schooner have an undoubted right to sue on behalf of the owners of the cargo for its value. It would seem that so suing their rights as bailees must be as great as if the owners of cargo joined as libellants. No final decree should, therefore, it seems, be made which will give the libellants a smaller amount as bailees than the owners of the cargo would be entitled to receive. And I think the same may be said as to the seamen.

But the fact that the suit is in personam ought not to make any difference as to the apportionment of the damage caused by the collision, including the value of any property lost or damaged. And, as between the owners of the two vessels, each must bear his half of the entire loss and damage. Therefore, as between the owners of the two vessels, the owners of the schooner must bear half the loss of the cargo. This is not enforcing a personal liability of the owners of this schooner beyond her value. It is simply apportioning between them and the owner of the steamer the damage caused by the collision and charging them with half of it and the owner of the steamer with half of it. The principle is the same as if the damaged cargo had been on board the steamer. In that case could the owners of the schooner say, We would not be personally liable for this loss because of the statute, therefore there shall be no rebate on this account. If they could say this, they could make the same plea as to the damage to the steamer herself, and so the principle of apportionment would be wholly set aside if one of the vessels is lost. Any other mode of adjusting the damage would not be an equal apportionment of the damage, which is to be regarded as a unit for this purpose, whatever may be the parts of which it is composed. The decree in the case of The Eleanora [Case No. 4,335], seems to have been entered in conformity with this view. The question of the effect of the statute limiting the liability of ship owners, cannot arise unless it shall appear that by such apportionment the libellants will not recover enough to reimburse the owners of cargo on whose behalf they sue. It seems to be unnecessary to make the owners of the cargo parties if that could be now done. They are virtually before the court through the libellants. The amendment asked for by the respondent, setting forth the damage to the steamer, is one that will conform the pleadings to the facts proved. It should therefore be allowed. The decree will be that the damage be apportioned and all questions as to what adjustments may be necessary in consequence of what may be shown as to the respective amounts of damage to cargo and other interests will be reserved till the coming in of the commissioner's report. And the point here decided on this motion may be reconsidered upon application for a final decree, if cause shall be shown for a rehearing. Decree accordingly.

[NOTE. After the decision was rendered in this case the libelants filed a petition alleging that the collision occurred without the proof or knowledge of the petitioners, and claim the benefit of the limited liability act (Rev. St. §§ 4283, 4285), especially in reference to their personal liability to the owners of the schooner for the value of the remaining one-half part of the cargo. The owners of the steamship filed exceptions to the petition, alleging that the petitioners were residents of Massachusetts, and not of this district, and that they, the owners of the steamship, were British subjects and neither residents nor served with notice of these proceedings in this country. They therefore denied the jurisdiction of the court upon the proceedings. Brown,

District Judge, held that the act of congress was intended in the administration of justice in maritime cases to apply as well to foreigners as to citizens of this country. As to the first exception, that none of the petitioners reside within the district, he held that the statute in the use of the words "in any district" clearly brought the case within the jurisdiction of the court, and further, that the parties are in any case virtually within the jurisdiction. In re Leonard, 14 Fed. 53. Exceptions were taken to the commissioner's report ordered to be taken by Judge Choate in the case above reported, assessing the value of the schooner at time of loss at $20.551. The exceptions are overruled, and the report confirmed. Leonard v. Whitwill, 19 Fed. 547.]