## THE WM. MURTAGH.

(*District Court, S. D. New York.* June 19, 1883.)

1. TUG AND TOW—NEGLIGENCE—UNSEAWORTHY BOATS.

    Where boats in a tow, by their condition and their loading, are obviously unfit to encounter the perils of a proposed trip, the owners of the tow and of the tug, both concurring in the trip, should be held liable in case of loss or damage.

2. SAME—TRIPS OF EXTRA HAZARD.

    The above rule does not necessarily apply to all trips, about New York bay, of open-deck coal-barges, but only to trips under circumstances of evident hazard.

3. SAME—OWNER OF GOODS CHARGEABLE WITH KNOWLEDGE.

    The owner of goods is legally chargeable with knowledge of the obvious gen eral character and description of the vessel in which his goods are shipped; and if he employ a boat obviously unfit for the trip, and loss happen thereby, as against third persons also chargeable with negligence, he can recover but half his damages.

4. SAME—SHIPPER OF COAL.

    An owner of coal, shipping it on board an open boat, has a right to assume that necessary care and caution will be exercised, both by her owner and by the tug, in not going out in hazardous weather; and if the latter do so, and the owner of the coal is not privy nor consenting thereto, he may recover of either his whole damage.

5. SAME—RHODIAN LAW.

    Though under the Rhodian law the shipper put goods on an old vessel at his own peril, by modern law he is protected by an implied warranty of seaworthiness; and, as against third persons, he can recover his full loss, unless her unfitness were actually known to him, or was a matter of such general notoriety that his knowledge or negligence is presumed.

6. SAME—ACTION FOR DAMAGES—FORMER SUIT A BAR.

    The owner of a vessel, in case of injury to the vessel and cargo, may maintain an action for damage to both against another vessel causing the injury; and after the latter has been once arrested, and given bail for the whole damage, if the owner of the cargo afterwards cause all claim on his account to be withdrawn from the suit, he cannot, ordinarily, again maintain an action against the same vessel *in rem*, and arrest her a second time for the same damage.

7. SAME—AGREEMENT NOT TO SUE—SECOND SUIT IN REM.

    But where an agreement was made with the owner of the cargo that he would not bring suit, but that his claim should be settled according to the event of a suit of the owner of the vessel injured, and pursuant thereto he withdrew his claim as soon as he discovered that it was embraced in the other suit, *held*, that he might afterwards maintain a second suit *in rem* pursuant to the agreement.

In Admiralty.

*Beebe, Wilcox & Hobbs,* for libelant.

*E. D. McCarthy,* for claimants.

BROWN, J. The libel in this case was filed by the owner of two cargoes of coal, on board the barge J. Stackpole and the barge A. J. Servis, to recover damages for the loss of the coal through the sinking of the barges on the twenty-ninth of November, 1879, on their way from Port Johnson to New York, in tow of the steam-tug William Murtagh. The two barges were part of a tow of 10 boats which left the "Stakes" near Port Johnson at about 2 o'clock P. M., forming

three tiers, with four boats in the first two tiers and two in the third. The J. Stackpole was the outer boat on the port side of the front tier, and loaded with 225 tons of buckwheat coal. The A. Servis was loaded with 212 tons of chestnut coal, and was the second boat from the port side of the second tier. When the tug started from the "Stakes" the wind was blowing at the rate of about 21 miles an hour. After coming out in the bay, the water was found to be rough, and when near Robbins Reef the boats became filled with water so that they had to be cast off, and shortly sunk. The Stackpole had no cover upon her hatches and had coal upon deck. The Servis was a western open boat. The cause of their sinking was taking in so much water through the open decks in the rough weather.

In the case of Mason v. The Wm. Murtaugh, 3 FED. REP. 404, the libelant, who was the owner of the J. Stackpole, brought suit to recover for the loss of that boat and her cargo. The facts in regard to the Stackpole are stated in the opinion of my learned predecessor, and need not be here repeated. The present case is submitted upon the same testimony, with some additions in regard to the A. Servis. In the former case it was held that the Stackpole, by reason of her open hatches and coal on deck, was unfit and unseaworthy for the trip across the bay in the state of the wind and tide then existing; that this unfitness and unseaworthiness were perfectly obvious and presumably known both to the owner of the boat and to the pilot of the tug; and that it was negligence in each to undertake the trip in the weather then existing; and a decree was ordered in favor of the libelant for one-half the damages.

As to the facts the same conclusions must be drawn in the present case as in the former; and the principle of the decision then made, that both the tug and tow, under such circumstances, are in fault, has since been repeatedly followed in this court and affirmed in the circuit. The Wm. Cox, 3 FED. REP. 645; S. C. affirmed, 9 FED. REP. 672; Connolly v. Ross, 11 FED. REP. 342; The Bordentown, 16 FED. REP. 270.

The obvious unfitness and unseaworthiness of the A. Servis, were even greater than in the case of the Stackpole. The Servis was wholly open from bow to stern; she had neither railings nor coamings, and was loaded within 15 to 18 inches of the water. She was also an old boat, and when she sank, broke apart, and, freed from the coal, came up in pieces. As respects both boats, therefore, the tug must be held responsible for negligence in undertaking the trip under the circumstances of that day.

As the owners of the boat sunk could recover but half their damages, it is urged that the libelant, who was the owner of the coal on both boats, can recover no more, on the ground that he is chargeable with similar negligence in shipping his coal on board of such boats for such a voyage. It must be admitted, I think, that a shipper is legally chargeable with knowledge of the obvious general character

and description of the vessel on which his goods are shipped. If he does not personally attend to the loading of his goods on board, he intrusts that service to some one who must be held legally to represent him in shipping them; and the obvious kind, quality, or condition of the vessel on which his goods are shipped, whether steamer or sailing vessel, whether open decked or closed, whether a ship or a scow, must be deemed to have been observed and known by the agent who represents the owner of the goods, and therefore legally brought home to the knowledge of the latter. In this respect transportation by water differs from carriage by land, where the bailee alone is personally intrusted with the goods. From time immemorial the ordinary shipment of goods by water has been upon some specific vessel, whose receipt or bill of lading binds the particular vessel and the goods by mutual obligations.

The oldest records of maritime law impose upon the merchant, at his own peril, the duty of inquiry concerning the age and seaworthiness of the vessel on which he ships his goods. Article 11 of the Second Fragment of the Laws of the Rhodians provides as follows:

"Let not merchants nor passengers put heavy and precious goods in an old ship; or if they do, and the ship setting sail the goods be spoilt or damnified, they must blame themselves. But when merchants hire ships, let them diligently inquire of others, who have formerly sailed in them, whether they be well provided with all necessary instruments, tackle, good sail-yards, sails, canvas, anchors, ropes, convenient rudders, good boats, and able, skillful, and sufficient mariners, and whether the ship's sides be sound; and, in fine, to comprehend all in one word, let them inquire about the ship's sufficiency in everything, and accordingly venture their goods."

The almost universal practice, which has long prevailed, of having vessels designed for maritime commerce rated and certified in regard to their qualities and seaworthy character by associations, such as the Lloyds, the French Bureau Veritas, and others, whose business it is to examine, classify, and approve such vessels according to their various merits and seaworthy qualities, whose reports and certificates are constantly referred to and relied on by merchants, is in accordance with the principle of this ancient rule; and, in the class of vessels to which such rating applies, it accomplishes the object of the rule far more perfectly than any individual inquiry could do.

If the A. Servis had been visibly and obviously wholly unfit for the voyage for which the goods were shipped, under even ordinary circumstances of wind and weather, or if her unseaworthiness were known to the shipper, and loss had happened through such unfitness and known unseaworthiness, the owner of the goods, upon the principle of the former decisions of this court, above referred to, must have been held chargeable with concurrent negligence, and therefore could have recovered but half his loss.

But it was not held in the previous decision that the employment of barges without hatch covers, or even the employment of open boats,

for the transportation of coal across New York bay from the Kills, a distance of about four miles only, is, in itself, negligence under all circumstances, and without regard to the condition of wind and weather. The passage usually occupies only from two to four hours; and in mild, pleasant weather there is no such appreciable danger in so short a trip as to make it negligence, *per se*, to ship coal for such a trip even in open boats. The decisions of this court in which negligence has been imputed to the parties, have been based upon the particular circumstances of the weather at the time, or had reference to trips on the sound, which are much longer, and subject to other known hazards.

The owner of the coal, in shipping it upon open boats, cannot, therefore, be held to be chargeable with negligence for that act alone. He had a right to assume that the captain or pilot of the canal-boat, as well as the captain of the tug, would exercise all proper and necessary care and caution in navigating her, and not proceed upon the trip when the weather or other circumstances would make it unsafe.

The owner of the coal in this case had nothing to do with the departure of the tow under the dangerous circumstances which resulted in the loss. He was not present at the time, and he was in no way privy to the negligence involved in going out with the tow at the time it went. He cannot, therefore, be justly charged with negligence contributing to the loss, any more than the owner of cargo in ordinary cases, who has a legal right to depend upon the exercise of prudence and diligence in avoiding danger by the captain of the ship with whom he intrusts his goods.

I have no doubt that the Servis was so old and rotten as in fact to be wholly unseaworthy; but I do not find that the libelant knew it, or that it was so generally known or ascertainable on inquiry that he should be held legally chargeable with any knowledge of it. In modern law the shipper has, ordinarily, a right to rely upon the implied warranty of seaworthiness as a part of his contract of shipment; and as between the shipper and third persons, like the owners of the tug in this case, the former is not, I think, chargeable with negligence as respects the defects of the ship, except in case of perfectly plain and obvious unfitness for the voyage, or such general and well-known unseaworthiness as warrants the inference of actual knowledge of it, or of such negligence in fact as is legally equivalent to knowledge. In this case the A. Servis was a western boat, not previously much known here; her rotten and weak condition is inferred only from her breaking up on sinking. These defects were not obvious to the shipper, and they would not ordinarily be learned by him on inquiry, under the circumstances of this case; and knowledge of them cannot, therefore, be legally imputed to him.

Moreover, the sinking of the Servis does not appear to have been in any way due to her weak and rotten condition, as was the fact in the case of *The Bordentown*, 16 FED. REP. 270. Here the

loss arose solely from the Servis being an open boat and taking in water over her sides; not from foundering, or from her planks starting, or her seams opening. As her weakness in no way contributed to the loss, it does not affect the case. As the tug is chargeable with negligence, and as the libelant is not chargeable with any negligence which contributed to the loss, he is entitled to his full damages against the claimant for the coal lost from the Servis. *The Atlas,* 93 U. S. 302.

In regard to the coal on board the Stackpole an additional defense is presented by the fact that in the former suit by Mason, who was her captain and owner, upon which the Murtagh was arrested and libeled *in rem,* the libelant sued to recover for the value of the cargo as well as for the value of the boat. After an interlocutory decree for the libelant for half his damages, an order of reference was taken to ascertain the amount. The agent, the present libelant, was a witness in that proceeding, and in the course of it, he, in behalf of the present libelant, withdrew all claim for the loss of the cargo in that suit. The proctor of the claimant protested at the time that if that was done no subsequent action for the cargo could be maintained. The withdrawal was, however, persisted in before the referee, and the report and decree in that case were entered for half the value of the boat only. The decree was entered in August, 1880, for $764.07, which was paid on September 13, 1880. The present libel was filed October 23, 1880, and the claimants, in their answer in this suit, have pleaded the former suit, decree, and payment in bar.

In the case of *The Nahor,* 9 FED. REP. 213, it was held by my predecessor, under circumstances in all respects similar to the present, that the vessel was not liable to be arrested a second time for the same cause of action after giving bail in the first suit. "The proper and usual course," says CHOATE, J., "if the owner of the cargo desires to be made personally a party to the suit, instead of intrusting its management to his agents, the master and owners of the vessel, is to petition to be made co-libelants with them." In that case, as well as in the case of *Leonard* v. *Whitwill,* 10 Ben. 638, 658, it was held that the owners of the vessel, as bailees of the cargo, have a right to sue on behalf of the owners for its value. As the former suit, therefore, was rightly commenced for the recovery of the value of the cargo as well as of the boat, the Murtagh was not liable to a second suit *in rem* for the same cause, at the instance of the owners of the cargo who were already legally represented in the former action, if there was no other circumstance affecting this right.

It was proved, however, in this case, that the present libelant had no knowledge that the former suit embraced a claim for the cargo, until the proceedings under the order of reference; that the present claimant, the owner of the Murtagh, and the agent of the libelant, in a conversation had at or about the time of the commencement of that suit, agreed together that they would abide by the decision in the

case of the Stackpole; that the libelant would not bring suit; and that, after the decision in the case of the Stackpole, the claimant would settle accordingly without suit. The claimant was a witness in the present case and did not deny this agreement. The decision in that case required the claimant to pay half the damages. Subsequent to that determination the libelant informed the claimant of the result and demanded payment, and, receiving no reply, this suit was subsequently brought.

The agreement was a valid one and upon good consideration; and the withdrawal of the claim in the former suit, when knowledge of it became known to the libelant, was an act conforming to the spirit of the agreement, and the respondent, therefore, cannot complain of the subsequent suit to the extent necessary to enforce the agreement previously made. The agreement, however, was only to abide by the decision of the former suit, and that decision imposed on the Murtagh only half the damages. To this extent, therefore, I think the present libel *in rem* should, under these circumstances, be sustained, notwithstanding the former suit embracing the same cause.

There is an additional equitable consideration why recovery in the case of the Stackpole should be limited to one-half the value of the cargo, viz.: that if the claim for the cargo had not been withdrawn in the former suit, the amount payable to the owner of the barge might have been applied in that suit, so far as it was necessary, to pay his share of the present libelant's full loss. The amount recovered by the owner of the barge was more than enough to pay his one-half of the loss of the cargo. By the withdrawal of the claim for loss of the cargo in that suit, such application of the money could no longer be made, and the claimant, when he afterwards paid the owner of the barge the amount of the decree, had a right to rely on his legal immunity from further suit to that extent, under the agreement, as a consequence of the withdrawal previously made by the libelant. As respects the cargo of the Servis, which was not embraced in the former suit, there is nothing in the agreement, or in the former suit, which prevents the libelant's recovery of his full damages.

Decree for the libelant for the full value of the coal on the Servis, and for one-half of that on the Stackpole, with costs. If the parties do not agree, a reference may be taken to ascertain the amount.