## Case No. 10,332.

### The NORTH 'STAR.

[15 Blatchf. 532.] [1]

Circuit Court, S. D. New York.    Feb. 1, 1879.

PRACTICE IN ADMIRALTY—VALUE OF VESSEL SUNK
BY COLLISION.

1. Mode of arriving at the value of a vessel sunk by a collision.

2. The value of a vessel is not necessarily her purchase price, with repairs added.

[Cited in Leonard v. Whitewill, 19 Fed. 548; Pettie v. Boston Tow-Boat Co., 44 Fed. 384.]

[These were libels by William H. Reynolds and others, owners of the Ella Warley, against Cornelius Vanderbilt, claimant for the North Star, and Cornelius Vanderbilt against William H. Reynolds and others, in which the district court decreed the Ella Warley to be solely in fault. (Case unreported.) An appeal was taken to the circuit court, where both vessels were held to be in fault, and the loss divided. (Case No. 10,331.) An appeal was then taken to the supreme court, where the decree of the circuit court was affirmed. 106 U. S. 17, 1 Sup. Ct. 41. It is now heard to ascertain the value of the Ella Warley.]

Erastus C. Benedict, for libellants.
Augustus C. Brown, for claimants.

BLATCHFORD, Circuit Judge. There is a marked difference between the values put upon the Ella Warley by the witnesses for the respective parties, as her value at the time she was sunk, February 9th, 1863. William Boardman, a builder and repairer of engines, who made repairs on her after the libellants bought her, values her at from $130,000 to $140,000, after the repairs. This he does on the idea that the repairs amounted to from $40,000 to $50,000, and that she was worth, before the repairs, from $75,000 to $80,000.

Joseph Belknap, the superintendent of Mr. Boardman's establishment, values the vessel, after the repairs, at $125,000. E. Freeman Poole, foreman for Ezra Bucknam, a shipwright, who repaired her after the libellants bought her, values her, after such repairs, at $75,000, outside of her engines and boilers. Merritt Woodhull, who says he knew her but knew very little about her, values her, judging from other vessels, at from $115,000 to $120,000.

John H. Clark, who knew of her, but does not remember that he ever saw her, puts her at from $75,000 to $100,000. Frederick C. Schmidt, who examined her casually after the libellants bought her and before they repaired her, puts her value after she was repaired at from $75,000 to $100,000, on the basis that $18,000 of repairs were put upon her.

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

The above are the libellants' witnesses as to value.

George W. Roosevelt, a shipwright, who had seen the vessel but would not say he had been on board of her, values her at from $35,000 to $40,000. Jeremiah Simonson, a shipbuilder, who knew her, and saw her while she was being built, fifteen years before she was lost, and was afterwards on board of her a number of times, but did not examine her, puts her extreme outside value at $40,000.

Charles H. Mallory, an owner and builder of steamers, who had been on board of her before the libellants bought her, values her at not over $40,000. Arthur Leary, who never saw her, says her full value would be $50,000. Richard Poillon, a shipbuilder, who had seen her, but does not recollect having been on board of her, judges that she would be worth about $45,000.

Charles H. Haswell, a surveyor for the marine underwriters, who had known her from the time she was built, and had surveyed her on eight different occasions, by examining her, and had rated her, and had examined her in December, 1862, after she was repaired, testifies that he formed an opinion at that time that she was worth $25,000.

Henry J. Bullay, who had seen her a good many times but had never been on board of her, values her at not above $30,000. R. P. Lugar, who had seen her and knew her age and condition, but had never been on board of her or examined her, says she was worth about $35,000. Nathaniel L. McCready, who had never seen her, puts her value at from $40,000 to $50,000.

The above are the claimants' witnesses as to value.

All the witnesses on both sides gave their testimony, none of them less than 8½ years after the loss, and some of them as much as 12 and 13 years after it. The libellants bought the vessel, in October, 1862, at an auction sale by the United States marshal, for $28,600. The amount they expended in repairing her and for expenses was $18,-122.37. All that was saved from her was some boats, amounting to $153.57. The commissioner reported, as her value, the amount of the purchase money and repairs and expenses, less the salvage, making the value $46,578.80, a computation too much by $10, according to the above figures. The libellants except to this value as insufficient and because it was not reported at, at least, $100,000. The claimants except because the mode adopted to arrive at the value by taking the purchase price and adding the repairs and expenses, was erroneous; and because the vessel was worth much less than the sum reported.

William Sparks, who was chief engineer of the vessel on one voyage from New York to Havana and back, after the libellants had bought and repaired her, which was her

only voyage on which the libellants sent her before the one on which she was lost, represents her as limber and weak and worked by the sea, and with insufficient boilers for her engine. George W. Palmer, who was mate of her on the same voyage, testifies as to her being limber and weak. Haswell testifies that she was very badly hogged when he last examined her, after she was repaired. The witnesses for the libellants do not contradict these statements of her condition. Boardman's estimate of her value is based on a very extravagant statement of the amount of repairs put upon her. Belknap dwells on the fact, that, at the time she was lost, there was a government demand for vessels for transport service. But, Mallory testifies that the government demand did not commence till June or July, 1863, and he is confirmed as to this by McCready.

It is quite clear, on the evidence, that the value reported is high enough. The only question is, whether it is not too high. It is manifest, that the value of a vessel is not necessarily her purchase price with repairs added. McCready so testifies, and he adds, that the value of a vessel depends upon her condition and her soundness and the business that may be offering for her in the market at the time she is for sale. I think the evidence shows that the $18,122.37 includes the 12 items of the year 1862 in the exhibit "Suydam," amounting to $4,567.96. These 12 items are for bedding, table linen, chairs, upholstery, carpets, stationery, medicine chest, scales, hose, chandlery, crockery, lamps and charts. These are mostly articles of permanent furniture and outfit, as distinguished from consumable supplies, but they do not form part of the vessel, except as to some of the chandlery, so as to come under the head of repairs to the vessel. They were all purchased before the voyage prior to the voyage on which the vessel was lost. Suydam, the agent of the vessel, says that he did not attend to the payment of the bills for those 12 items. The testimony is, that the $18,122.37 includes what was paid for "repairs and expenses." Even on the principle adopted by the commissioner, the $4,567.96, or a large part of it, should be deducted from the $18,122.37. If all were deducted, it would leave $13,554.41. Adding to that the $28,600 would make $42,154.41. Deducting from this the $153.57 would leave $42,000.84.

But, on the whole evidence, and disregarding the mode of computation adopted by the commissioner, the fair value of the vessel, at the time of her loss, cannot be put at over $40,000, and I fix it at that sum, over and above the value of the boats saved, $153.57.

I concur with the commissioner, that there is no sufficient proof as to what the net amount of the freight and passenger money would have been. It is not shown how much of the $3,207.94 of supplies bought in January and February, 1863, would have been consumed in earning the freight and passenger money. It is, therefore, proper to disregard the claim for freight and passenger money, and it is proper to allow the entire amount of the exhibit "Suydam," $7,775.90, as outfit and stores on board at the time of the collision, less $100 for coal and stores consumed up to the time of the loss.

Let a decree be prepared on the above basis. The libel alleges the "loss of the vessel, &c.," and claims damages for such loss to the amount of, at least, $75,000. The record does not show that the testimony as to the loss of stores and outfit was objected to because not alleged in the libel. But, the libellants may amend the libel in that respect, and, also, as to freight and passenger money, if desired.

[For the final apportionment of the damages, see Case No. 16,839.]