### LEONARD and others *v.* WHITWILL.

*(District Court, S. D. New York. February 6, 1884.)*

1. COLLISION—VALUE OF VESSEL—HOW ASCERTAINED.

   In ascertaining the market value of a vessel sunk in a collision, the commissioner or court is not restricted to the evidence of competent persons who knew the vessel and testified as to her market value, though that is in general the best single class of evidence.

2. SAME—COST OF CONSTRUCTION.

   Where the period of collision is one of great stagnation in the market, and there are no actual sales to furnish a criterion of market value, the cost of the vessel, with deductions for deterioration, especially when the vessel was recently built, may be properly resorted to in determining the value.

3. SAME—CARE AND RETURN OF CREW.

   Though the rescue and care of the crew of a ship sunk in a collision is not, in the absence of statutory provisions, a legal obligation in the sense of entailing penalties or pecuniary damages for neglect of it, it is a maritime obligation recognized in the admiralty; and any actual expenses incurred by the surviving ship in cases of collision in the rescue, support, and return to land of the crew of the vessel sunk, should be held a part of the pecuniary damage arising from the collision, and divided between the two vessels, where both are in fault.

4. SAME—DAMAGES—DEMURRAGE.

   Where the British steamer A., which, after a collision with a schooner off Long Island, took on board the captain and crew of the schooner which was sunk, and put back towards New York with them, and on meeting a pilot-boat paid £25 for the conveyance of the captain and crew to New York, and then put about on her voyage for Europe, being detained thereby one day, and having consumed £11 worth of coal extra, *held,* that under the maritime law, as well as under the St. 25 and 26 Vict., the steamer should be allowed to bring into the account, as part of her damages arising from the collision, £20 demurrage for one day's detention, together with the £11 for coal, and £25 for the money paid for conveying the captain and crew to New York.

5. SAME—VALUE OF FURNITURE AND PERSONAL EFFECTS.

   In estimates of the value of furniture or personal effects lost, a deduction may be made from the market value of similar articles new, according to the period and time of use, notwithstanding the owner's testimony that to him they were as good as new.

Exceptions to Commissioner's Report.

*Scudder & Carter* and *Geo. A. Black,* for libelants.

*Foster & Thomson* and *R. D. Benedict,* for respondents.

BROWN, J. The schooner Job M. Leonard having been sunk in the Atlantic ocean, off Long Island, on April 18, 1877, through a collision with the steamship Arragon, owned by the respondent, this

court, by its decree in November, 1879, found both vessels in fault, and it was referred to a commissioner to ascertain the damages. *Leonard* v. *Whitwill*, 10 Ben. 638. Exceptions to the report have been filed by both parties. The value of the schooner at the time of the loss has been reported at $20,551. On the part of the libelant three witnesses who had seen the schooner testify that her value at the time of the loss was at least $26,000; other witnesses for the libelant estimate her at from $25,480 to $33,000. Witnesses for the respondent place her value at the time of the loss from $15,750 to $18,000. In this wide discrepancy, the mode of ascertaining the value adopted by the commissioner was to take her cost of building, $24,000, in 1874, and deduct therefrom 6 per cent. per annum for deterioration up to the time she was sunk in 1877, add the cost of a new set of sails recently put on her, less a slight reduction for a short period of use, and then from this deduct 5 per cent. for the difference in the cost of building and consequent market value between the year 1874 and the year 1877.

The libelant's principal exception is to the mode in which the commissioner arrived at the value of the ship, as above stated, insisting that as evidence was given of her market value by persons who had seen her and knew her, that the commissioner had no right to resort to other methods. *The Colorado*, Brown, Adm. 411; *The Ironmaster*, Swab. 443; *Dobree* v. *Schroder*, 2 Mylne & C. 489. While it is undoubtedly true that the best single class of evidence of market value is the opinions of. competent persons who knew the vessel and who knew the state of the market at the time of the loss, it does not follow in any given case, because witnesses testify to certain facts, that either the commissioner or the court is shut up to their evidence without giving any heed to other kinds of evidence which may be offered. The cases cited by the appellant recognize equally the competency of evidence of the cost and deterioration as bearing on the amount to be allowed. Where from stagnation in the market at the time of the loss there is difficulty in fixing the precise market value, a resort to other modes of ascertaining it, especially where the vessel has been built but a few years, is at least allowable to be taken into account in arriving at a conclusion. The evidence shows that in 1877, when this vessel was lost, the market for sailing vessels was in a state of stagnation, and it was almost impossible to ascertain any actual sales which would furnish proper *data* or any criterion for the determination of the actual market value. The different values sworn to are after all but mere estimates, and not based on knowledge of similar sales in 1877. It is impossible in such cases to determine the amount to be allowed with mathematical certainty. I do not find from the evidence sufficient reason to interfere with the result at which the commissioner has in this case arrived. In the case of *The North Star*, 15 Blatchf. 532, the value put upon the Ella Warley by the witnesses varied from $25,000 to $110,000; the court fixed it at $42,000. In the

case of *The Utopia*, 16 FED. REP. 507, the estimates of value ranged between $8,000 and $15,000; $10,000 was allotted.

The charges of the captain for superintendence during the construction of the ship were, I think, rightly disallowed as no proper part of the cost of her building.

Another item excepted to by the libelant is the allowance by the commissioner of certain expenses incurred by the ship in providing for the captain and crew, in consequence of the sinking of the schooner at the time of the collision. These men were obliged to take refuge upon the steamer. Instead of taking them with her to Europe, she returned towards New York, and after proceeding a part of the way, came up with a pilot-boat, to which she transferred the captain and crew of the schooner, paying £25 for conveying them to New York, whereupon the steamer turned about and proceeded on her voyage. The steamer was detained in this way about a day, and consumed additional coal to the value of £11. The commissioner has allowed the value of the extra coal, the £25 paid, and £20 as demurrage for the detention of the steamer in going back with the crew, as part of her damages arising out of the collision. Counsel for libelant claims that the expenses thus incurred, amounting to £56, for the return of the captain and crew to New York, were not legal obligations on the part of the steamer, and are therefore to be regarded as charges voluntarily incurred, and not a ground of compensation in this account. In the case of *The Mary Patten*, 2 Low. 196, where both vessels were in fault, an allowance was made to one of the steamers for towing into port the other which was disabled, not by way of salvage, but as a *quantum meruit* for an act which was proper and necessary, and for the benefit of both parties, and therefore as part of the damage which the common fault had caused to the steamer. LOWELL, J., says in that case that "the duty to stand by and save life, at least, cannot be said to be of strictly legal obligation, because no law has yet visited the offender with damages for a breach of it." Nevertheless, the obligation of the ship not disabled, in cases of collision, to render all possible assistance to the injured vessel and to her crew, has been recognized as affecting the pecuniary rights of the parties when suing in admiralty. In the case of *The Celt*, 3 Hagg. 321, Sir JOHN NICOLL, in a suit against the ship that was uninjured, while he dismissed the libel because it appeared that the collision arose from no fault of the vessel sued, yet he condemned her in costs and expenses because the master had neglected to render assistance to the vessel as requested, and after taking her master and crew aboard his own vessel, had landed them in a state of destitution on the coast of Ireland.

The schooner in this case having been sunk immediately through the fault of both, some provision for her master and crew was necessary. They could not be left to drown or starve. If not returned to New York, the nearest port, they must have been taken to Europe

and back, and supported in the mean time. The necessary care of the master and crew, upon the sinking of their ship, necessarily devolved upon the Arragon, which was substantially uninjured by the collision; and the expenses necessarily attending such care should be deemed to have been incurred in the performance of a maritime duty, and not as a mere voluntary charity. Practically, these expenses were unavoidable. They were the immediate and necessary result of the collision, and consequent sinking of the schooner; and as the collision arose from the joint fault of both, these charges, which were the unavoidable result of the collision, should be held to be at the expense of both. There is no reason why they should be borne by one rather than by the other. In a court of admiralty, at least, the obligation to provide for the master and crew of the sinking ship should be regarded as obligatory, so far as to entitle the ship rendering assistance to the other to bring the necessary expense of doing so into the common account. The Arragon in this case, moreover, was an English steamer, and by 25 and 26 Vict. c, 63, § 83, failure to render such assistance is declared to be misconduct; and by that act the duty was imposed upon her master to render to the other ship and to her master, crew, and passengers such assistance as might be practicable, and failure to do this is not only made presumptive evidence that the collison was by his own wrongful act, but would have made the master liable to have his certificate canceled for misconduct. This statute having thus made the assistance to the crew of the schooner legally obligatory, there would seem to be no room for doubt that the expense to which she was put in rendering this assistance should be held a part of the legal damage arising from the collision. No objection was made to the mode in which the assistance was rendered. It seems to have been the most convenient and reasonable that could have been adopted; and this item should therefore be allowed.

In estimating the value of the captain's furniture and personal effects, certain deductions were made by the commissioner from the cost price, varying on some articles from 10 to 50 per cent., while on the remainder the market value, at the time of the loss, was allowed. Where articles have been in use for a considerable time, the owner has no right to insist upon the full cost price because he may claim that they are to him as good as new. A reasonable deduction may certainly be made from the cost of such articles, having reference to the period and manner of their use, as might be done by a jury in similar cases in an action at common law. *Jones* v. *Morgan,* 90 N. Y. 4, 10. As regards this and the other items excepted to, I think the commissioner's report should be confirmed.