## ASTSRUP *v.* LEWY and others.

## LEWY and others *v.* THE EXCELLENZEN SIBBERN, etc.

*(District Court, S. D. New York. February 7, 1884.)*

1. SHIPPING—IMPROPER STOWAGE—DAMAGE TO CARGO.

Where in a short but violent gale the bottom of a bark gave way in the middle from four to five inches, through overloading with iron rails amidships, causing a bad leak, whereby a cargo of rags was damaged, *held,* that the negligence of the vessel in improper stowage was the proximate cause of the leak, for which the ship was responsible, and that the consequent damage was not through perils of the seas, within the exception of the bill of lading.

2. SAME—MASTER'S AUTHORITY TO SELL—NOTICE.

The master has no authority to sell damaged cargo in a foreign port without notice to the owner or shipper, when there is abundant time and means for communication with him.

3. SAME—CASE STATED—BILL OF LADING—QUALITY UNKNOWN.

Where the bark E. S., laden with rags and railroad iron, in a voyage from Libau to New York, sprung a leak in a gale in the North sea through overloading amidships, whereby some of the rags were wet; and being obliged to put in at Cowes for repairs, the cargo was all unloaded, and a considerable portion of the rags was found to be hot, steaming, and rotten, and not capable of being put into condition to be brought to New York; and communication being practicable with the shipper at Libau by mail within three days, and by telegraph daily; and that portion of the cargo not capable of being brought to New York having been sold after repeated surveys, and under the advice of the consul, after notice sent by him to the shipper at Libau without answer or direction received in reply, and the sale being fairly made, *held,* that the sale was justifiable, but that the vessel was responsible for all loss occasioned by the leak through overloading amidships. *Held, also,* that under the terms of the bill of lading, " quality unknown," the vessel might show bad condition of the rags when shipped; that the steaming condition of the rags on the morning following the gale was an indication that part were probably shipped in bad condition; and there being no direct evidence of their condition when shipped; *held,* that that question should be submitted for further evidence before the commissioner in connection with proof of damage occasioned by the ship's leak.

4. EVIDENCE—COMMISSION—ANSWER TO GENERAL INTERROGATORY.

Upon commission to examine the consul at Cowes as a witness in behalf of the bark, the consul, in reply to the last general interrogatory, whether he knew anything further to the advantage of the ship, having replied that he and his firm communicated with the shipper at Libau before the sale and received no answer or direction; the subject being nowhere else alluded to in the pleadings, interrogatories, or testimony, and the commission having been returned and filed a year before the trial, *held,* that the answer should stand, and that it was sufficient *prima facie* evidence of proper communication with the shipper in the absence of any countervailing evidence, and that the motion to suppress that answer or for leave to cross-examine by further interrogatories should have been made before trial.

The above libel *in personam* was brought to recover the sum of $1,566.62 freight for 941 bales and 66 bags of rags shipped on the bark Excellenzen Sibbern, at Libau, April 22, 1880, to be delivered in New York. The libel *in rem* was brought to recover damages for the non-delivery of 524 bales and 28 bags, part of the above shipment, valued at $15,000. The rags not delivered were sold by the master at Cowes, at which port he had been obliged to put in, in distress. The cargo was there unloaded for the purpose of repairing

the ship, and a portion of the rags being found so damaged by wet, heat, and rottenness that, despite all efforts to improve their condition, they were deemed unfit to be reshipped, they were condemned on survey and sold, so far as salable, and other portions thrown away as worthless. For the vessel, it was contended that the injuries to the bark were caused solely by the severe weather which she encountered in the North sea; that the rags were in a wet and unfit condition when shipped, which in part caused their damaged condition at Cowes; and that the sale of the damaged portion was necessary; was effected in the best manner; and was made after notice sent to the shipper, (the bill of lading being to order,) to which, however, no answer was received. On behalf of the shipper, it was contended that the rags were all shipped in good condition; that the damage to the vessel, and her consequent leaking, and the injury to the rags, arose from the unseaworthiness of the vessel, through the improper stowage of the iron, too great weight being placed between the main and the after hatch, which caused the bottom of the vessel to give way and her keel to drop from three to five inches; also, that no proper communication to the shipper was proved, and that the sale of the rags at Cowes was unauthorized.

The Excellenzen Sibbern was a Swedish vessel, 359 tons register, about 500 tons burden, built in 1874, and rated in 1877 in the French Veritas as A 1; length, 130 feet; beam, 27 feet; depth, 14 feet; and single decked. Her cargo on this voyage consisted of 1,362 old iron T rails, weighing about 251 tons, and 186½ tons of rags; in all 437 tons weight. Both were shipped by H. Seelig, at Libau, to be delivered in New York to order. The vessel commenced loading on February 26th; 400 rails were put in the bottom of the ship; then rags; then above the rags, in a sort of trunk-way running fore and aft along the middle of the vessel, the remaining 963 iron rails; and then rags on top. The rags were stowed by a regular stevedore; the rails by a common laborer. The bark, according to the testimony of the master, was in perfect condition on leaving Libau, having had a new set of sails and new rigging. She sailed for New York on April 9th, touched at Copenhagen, and left the Elsinore roads on the evening of the 14th. On the afternoon of the 21st she encountered a heavy gale in the North sea, which abated on the evening of the 22d. On the morning of the 23d the vessel was found leaking heavily, and, on removing the hatches, it was discovered that the bottom of the vessel had given way in the middle, so that five of the stanchions running from the keel to the deck-beams were from two to five inches short. The mate testified that the bark sprang aleak on the night of the 21st or 22d; that they "could hardly keep it up with the pumps; it kept us pumping all the time;" that after the storm "we got down in the hold and could see that the bottom was sunk four inches, from the fore part of the main-hatch to the after-hatch; she was all the way along a little, a very little, from the fore-mast to the mizzen-mast; all the keys were

broken, and all the stanchions from the main-hatch to the after-hatch;" that "she had given way a little in the water-ways and seams;" the distance she had sunk down "when it was heavy seas was between four and five inches; she jumped up and down; the bottom was keeping jumping up and down on her;" and that after arrival at Cowes the bottom was still sunk some three inches or three and a half inches, and made at anchor about two or three inches of water per hour. On the 23d, when the hatches were opened, the bales of rags were in a heated and steaming condition. On discharging the cargo at Cowes, a few days after, some of the bales were so hot as to burn the hands in handling them. On the 28th the master, having instructions from the owners of the ship, ordered the requisite survey. In the report of April 29th it is stated that the vessel "had gone down very much in her center between the fore-part of the main-hatch and the fore-part of the after-hatch. In this part of the ship the hold stanchions were torn away from the beams and had sunk about two inches; the main-mast and the beams appeared to have gone down about two inches," and the main-mast and pumps the same. In the report of the survey of the cargo, May 11th, 524 bales and 28 bags of rags were reported in a very wet and damaged state; many of them so greatly heated as to be actually smouldering; they were directed to be kept separate and in 'the open air as long as practicable, with the view of partly drying them. Ten other bales, slightly wet, were directed to be opened, dried, and repacked. Upon a further survey directed by the consul, the surveyors, on the twelfth of June, reported that on previous surveys, particularly on the third of June, the bales and bags above referred to had been found extremely wet and damaged, a large number of them greatly heated, and many in a rotten and partially decomposed condition; that, where practicable, the bales were opened and exposed to the air with the view of improving their condition, and that no perceptible improvement was effected; and that, believing that they could not reach New York without becoming entirely worthless, they had on the third of June condemned the whole of said bales and bags as quite unfit for shipment and had recommended their sale at auction; and that on the eleventh of June they had again re-examined the rags with a rag merchant, and that they adhered to their previous conclusion, in which the merchant concurred. About May 25th notice of the intended sale of the rags for June 15th was given by advertisements put in the *Shipping Gazette* and in the local and London newspapers; hand-bills were also extensively posted. The sale was conducted by an auctioneer accustomed to the sale of all kinds of damaged cargoes, who testifies that the sale was attended by at least 150 persons, many of whom bid for the various lots; that the competition was brisk; and that he considered the sale satisfactory for goods in such a damaged condition, many of the bales being quite rotten, and "having to be packed in bags before they could be weighed."

The consul, who was examined upon commission, in answer to the general interrogatory if he knew of any other thing of benefit to the vessel or her owners, said:

"My firm, as agents, and the captain personally, communicated with the shipper of the cargo at Libau on the arrival of the ship at Cowes, and afterwards; but the shipper made no reply to such communication nor gave any directions; the parties claiming to be the owners of the rags were not communicated with, because neither their names nor addresses were known."

The repairs of the vessel being completed, she left Cowes June 25th and arrived at New York on the thirteenth of August. A portion of the rags delivered in New York, it is claimed, were in a damaged condition. The bill of lading of the rags contained the following clause: "Quality, weight, and marks unknown; the rags loaded under and over iron."

*Sidney Chubb* and *Chas. M. DaCosta,* for the shippers.

*Hill, Wing & Shoudy,* for the Sibbern and owners.

BROWN, J. Upon the evidence in this case it must be held that the sinking of the keel and bottom of the bark prior to her arrival at Cowes was an unusual and extraordinary occurrence. Cumming, a stevedore, one of the experts in behalf of the vessel, testified that with heavy cargoes on the ship's bottom, it was not unusual that there should be a sinking of from one to three inches, but that he never knew of a case of a sinking of five inches; and that, in his judgment, 150 tons, with possibly 20 additional, would have been a suitable weight over a space of from 40 to 60 feet along the center of the vessel, and that the sinking of the bottom, to which he refers, might or might not cause the ship to leak, according to circumstances. The mate says that her bottom dropped from four to five inches at sea, and from three to three and a half when lying still at Cowes. Karbek, the carpenter, testified that "the ship gave way; she sank in the middle four inches." Other witnesses make it from three to four inches. Although the bark met with a severe gale, which came on during the afternoon of April 21st, it was scarcely more than of 24 hours' duration, since the protest expressly states that it abated on the evening of the 23d. The sea is spoken of as running very high, and some water swept the deck; but, it must be noted, that nothing was carried away, nor a spar lost; and it seems to me that the testimony of the experts on behalf of the shippers, and their judgment, considering the circumstances above mentioned, are entitled to the greater weight, and that there was nothing so extraordinary in the weather encountered on the twenty-first and twenty-second of April as to account for the extraordinary result upon the ship, and for her dangerous leaks, had she been seaworthy in both hull and stowage when she sailed. Accepting the testimony of the master, that her hull was in good condition when she left Libau, and her rating A1 three years previous, the only adequate cause that can be perceived for this extraordinary result is in the mode of loading the iron rails,

namely, too great quantity amid-ships.   The evidence leaves no doubt that the chief sinking of the vessel at the bottom was in the middle, from the fore part of the main hatch to the after hatch, and this is where it appears, upon satisfactory proof, that the ship was overloaded.   Cumming, the expert in behalf of the vessel, would allow as proper but 150 to 170 tons weight along that portion of the ship; the evidence indicates that there were at the least 225 tons within that space, and probably considerably more.   Nine hundred and sixty-two of the rails were placed in the trunk-way in that part of the ship; if of average weight, they alone amounted to 176 tons.   The trunk-way, which was on top of the first course of rags, was eight feet wide, running fore and aft along the center.   The general mode of stowage was approved by all the witnesses, provided the upper course of rails was sufficiently distributed in length fore and aft. While the testimony on this point is not so exact and explicit as could be desired, the inference from the testimony of the mate and stevedore is strong that this trunk-way was amid-ships, and did not extend to the fore-mast, as claimed.   The expert for the vessel testified that the frequent loosening of the stanchions, to which he referred, was between the main-mast and the fore-mast, and that there ought not to be weight enough aft to loosen the stanchions in the end of the ship; and that the loosening he referred to was not from the dropping of the keel, but from the ends of the beams going down.   In this case, the chief dropping of the bottom was from the main hatch aft; while the captain and all the other witnesses from the ship spoke of her bottom and keel as giving way in the middle; "not worth mentioning," the captain said, "except in the middle."   The mate said "the bottom sank four inches, and in the seas kept jumping up and down from four to five inches."   The carpenter said "the ship gave way; she sank in the middle four inches."   The weight of the cargo in the middle, even according to the testimony of the ship's own expert, with the corresponding special injury and extraordinary leaking arising from her bottom's giving way, particularly in just that part of the ship, seem to me to leave no reasonable doubt that she was overloaded in the center; and the testimony of the master, that the rails were loaded by a common laborer, while a stevedore was employed to load the rags only, would indicate that the overloading of the center arose from a want of suitable judgment and experience in the distribution of the cargo.   As I must find, therefore, that this improper stowage was the cause of the vessel's giving way at the bottom, it follows that the ship must answer for the damage caused by the giving way of the vessel and by the consequent leak; since, in such a case, the damage is not  to be ascribed to perils of the sea, but to the negligence and fault of the vessel.   Clark v. Barnwell, 12 How. 280; The Regulus, 18 Fed. Rep. 380.

2. Under the circumstances of this case, I cannot doubt that it was the duty of the master, by the general maritime law, to communicate

with the shipper before selling the damaged rags at Cowes. Communication between Cowes and Libau could be had in the ordinary course of mail within three days, and by telegraph within twenty-four hours. There was abundant time and opportunity for communication. The ship was laid up there several weeks for repairs, and the rags were condemned by the surveyors as unfit to be taken to New York on the third of June, a week after the ship's arrival at Cowes. It is not questioned that, under the English maritime law, notice to the owner, where notice is easy and practicable, is an essential condition of a master's authority to sell or to hypothecate either the ship or cargo, whether the object be to obtain money for the repair of the ship, or merely the sale of damaged or perishable goods. *Acatos* v. *Burns*, 7 Exch. Div. 282; *The Australasian, etc.,* v. *Morse,* L. R. 4 P. C. 222; *Cammell* v. *Sewell*, 3 Hurl. & N. 634; *The Gratitudine*, 3 C. Rob. 240; *The Hamburg*, 2 Marit. Law Cas. 1; *Atlantic Mut. Ins. Co.* v. *Huth*, 16 Ch. Div. 474. These cases all rest upon one common principle, that the master, by virtue of his general authority, does not have any right to sell or hypothecate either the ship or the cargo; that his authority in these respects rests upon necessity solely and upon the particular emergencies of the occasion; and that this authority is therefore limited by the nature and extent of the necessity. If the owner is at hand and can be easily communicated with, the master must advise the owner of the facts, and take his directions; and where such directions may be obtained, there is neither necessity, nor authority, nor justification for the master to assume to sell or to hypothecate without notice. These principles I understand to be substantially adopted by the supreme court in the case of *The Julia Blake*, 107 U. S. 418, [2 Sup. Ct. Rep. 191,] affirming the judgment of the district and circuit courts of this district. 16 Blatchf. 472. See, also, *The Amelie*, 6 Wall. 18, 27; *The C. M. Titus*, 7 FED. REP. 826, 831; *Butler* v. *Murray*, 30 N.Y. 88, 99; *The Joshua Barker*, Abb. Adm. 215; *Pope* v. *Nickerson*, 3 Story, 465; *Myers* v. *Baymore*, 10 Pa. St. 114; *Hall* v. *Franklin, etc. Ins. Co.* 9 Pick. 466; *Pike* v. *Balch*, 38 Me. 302. In a case like the present, where there was no need of selling the cargo for the benefit of the ship, but the sale was made for the reason only that the damaged cargo could not properly be taken to the port of destination, and where there was abundant time and means of communication with the owner or shipper to ascertain his wishes as to the disposition of his goods, there was plainly no necessity for a resort by the master to any extraordinary and exceptional powers. While I should sustain, therefore, the principle invoked by the counsel for the shipper, I am not prepared to find, upon the case as submitted, sufficient evidence of remissness on the part of the master to hold the sale unauthorized.

No question was made as to the want of notice in the pleadings in either of these two cases. In the examination of witnesses upon commission, no question was put by way of examination or cross-ex-

.amination upon this subject, nor in the examination of the master here in 1880 was any allusion made to it by counsel on either side. The counsel at Cowes, in his deposition, however, in answer to the last general interrogatory on the part of the ship, stated that his firm, as agents, and the captain personally, communicated with the shipper at Libau; but the shipper made no reply, and gave no directions. From this answer it is obvious that the consul, under whose advice the several surveys and repairs of the ship, as well as the surveys and sales of the cargo, were made, was familiar with the well-settled English rule requiring notice to be given; otherwise he would not naturally have volunteered this testimony without his attention being directed to the subject. This, of itself, furnishes a strong presumption in aid of his own testimony that such communication was sent, and that no answer was received. Upon the trial, counsel for the shipper moved to strike out this answer, for the reason that it was volunteered, and was upon a subject as to whi. h the witness was not interrogated, and as to which there had consequently been no opportunity for cross-examination. The commission, however, had been returned and filed more than a year before the case was brought on for trial, and the court declined to strike out the testimony, for the reason that it was material, and because there had been abundant opportunity either for the motion to strike out to be made earlier, or for the return of the commission for further cross-examination if that had been desired; and as neither party had taken any steps in regard to this part of the commission, the answer should be allowed to stand. Although the consul's answer is. quite general, and does not state what particular facts were communicated to the shipper, yet as the evidence of a public officer, acting in discharge of known duties under the maritime law,.and in no way personally interested, it seems to me that every intendment is to be made in its favor. The goods being consigned to order, only the shipper's name was known; no other communication or notice was therefore required than to the shipper; and the consul's statement is that they communicated with the shipper at Libau and got no answer nor any directions. Du..ng the long time that has elapsed since this commission was returned and filed there has been abundant opportunity to obtain the shipper's testimony by commission, and to show, if such was the fact, that no such communication was ever received, or if received, that it was too late, or for any other reason insufficient. As no evidence of this kind has been procured, and no reason given for not obtaining it, if material, I think the answer of the consul, though brief and general, is nevertheless *prima facie* sufficient evidence of compliance with the obligation to communicate with the owner. The objection upon this ground cannot, therefore, be sustained.

3. In regard to the sale itself I see no reason to doubt that it was fairly conducted, with every reasonable preliminary effort to do the best that could be done, and to realize the best prices for the dam-

aged goods. It appears to have been well advertised; a numerous company was in attendance on the sale, and the competition brisk. No evidence was adduced that the prices obtained were inadequate. The fact that one of the purchasers, shortly after the sale, sold his lot at more or less profit, the amount not stated, is not sufficient evidence that the sale was unfair or the price realized too low.

4. The evidence as to the condition of the rags when the hatches were opened on the twenty-third of April, and when the bark arrived at Cowes on the twenty-seventh, is such that I cannot resist the conclusion that a part of the rags was not shipped in good order. The evidence as to the filthy, rotten, and offensive condition of many of the bales when unladen a few days after the arrival at Cowes, some being so hot as to be actually smouldering, is so strong as, in my judgment, to necessitate the inference of bad condition when shipped. The qualification on the bill of lading, "quality, weight, and marks unknown," takes away any presumption which might otherwise be derived from the bill of lading, of good condition internally when put aboard, and leaves this question entirely open to any inferences which may be properly drawn from the proofs. *Clark* v. *Barnwell*, 12 How. 272; *The Querini Stamphalia*, 19 Fed. Rep. 123, and cases cited. In the absence of any testimony as to the condition of the rags when shipped, or as to the time within which sound rags might become injured to such a degree from sea-water, the damages, as described by the witnesses, seem to me too great to be ascribed solely to the leak arising on the twenty-second of April.

In the libel filed by Lewy and others, the libelants are therefore entitled to a decree for such damages to the rags as arose from the giving way of the bottom of the vessel in the storm of April 21st and 22d, and a reference will be ordered to compute this damage. As the evidence is very meager and is insufficient to form any confident or certain judgment concerning the condition of the rags when shipped, the whole question touching that matter, as affecting the damages caused by the fault of the ship, may be heard before the commissioner upon this reference on such further evidence as either party may introduce, without prejudice from anything herein contained on that subject. The ship will be responsible for such injury only as is properly attributable to her springing a leak on the twenty-second of April through the giving way of her center, excluding whatever damage may have arisen from any improper packing or condition of the rags then shipped, if any such be found. Upon this reference, also, the condition of the rags that arrived in New York will necessarily form a part of the evidence bearing upon the question of the condition of the rags when originally shipped; and hence any question of damage to the bales which were delivered here should also be determined now, to avoid further suits on the same subject; and an amendment of the pleadings may be made accordingly, as moved for. *The North Star*, 15 Blatchf. 532, 536.

An order in conformity herewith may be settled on two days' notice.