THE REDWOOD.

ERIKSEN v. PACIFIC AMERICAN FISHERIES.
No. 7785.

Circuit Court of Appeals, Ninth Circuit.
Feb. 3, 1936.

Howard G. Cosgrove, Robert S. Terhune, and Cosgrove & Terhune, all of Seattle, Wash., for appellant and cross-appellee.

Lawrence Bogle, Edward C. Dobrin, and Bogle, Bogle & Gates, all of Seattle, Wash., for appellee and cross-appellant.

Before WILBUR, GARRECHT, and MATHEWS, Circuit Judges.

GARRECHT, Circuit Judge.

This case arises out of a collision between the steamer Redwood and the halibut fishing vessel Sun-d'E, in which the Sun-d'E was rammed by the Redwood, opening a hole in her port bow, from which she filled with water and subsequently sank. The collision

occurred in the waters of Grenville Channel, British Columbia, which is a link in the inland passage to Alaska. This channel is a long, straight, narrow body of water, running generally northwesterly and southeasterly; its southern end being approximately 500 nautical miles north of Seattle, Washington, and its northerly end being approximately 400 nautical miles south of Ketchikan, Alaska. It varies in width from one-fourth to one nautical mile and is forty-five or fifty miles in length. The collision happened at a spot between Lowe Inlet North Point Beacon on the north and Yolk Point on the south, the places named being landmarks on the channel. The channel was approximately one mile in width at the point of collision.

The Sun-d'E was sixty-seven feet in length and of fifty-four tons gross burden, the libelant Eriksen being the owner and master thereof. The Redwood is 226 feet in length and 1,793 tons gross burden, owned by appellee, and was under the command of Captain Jackson.

The trial court found (III):

"That the said 'Sun-d'E' with said libelant as master, and a crew of eight, loaded with supplies and equipment, sailed from the Port of Seattle, Washington, for Cook's Inlet on a fishing lay, and proceeding without incident to Grenville Channel, arrived off Yolk Point not less than one-half mile abeam, September 4, 1933, at 2:25 a. m., at which time she was proceeding at 8 knots per hour, which was her maximum speed. At this time her course was changed to W x N ¾ N magnetic, and maintained to the time of collision hereinafter mentioned. About five minutes after such change of course she encountered thick fog, which continued until after said collision. Upon entering the fog her speed was reduced to 4 knots per hour, which speed was maintained until 3:50 a. m. From the time the 'Sun-d'E' entered said fog, and until said collision, her regulation lights were in good order and condition and brightly burning, and she continued to sound at regular intervals the required fog signals. During said period the weather was calm, the sea smooth, and the tide strong ebb, the master was in the pilot house, a competent man was stationed at the wheel and another upon the forecastle head as lookout. After running upon said mentioned course for approximately five and a half miles, at 3:50 a. m. a steamer's whistle was heard on the port bow, upon which the 'Sun-d'E's' clutch was

immediately disengaged. At 3:53 a. m. a second whistle was heard, also upon the port bow. At 3:54 a. m. a third whistle was heard upon the port bow, upon which the 'Sun-d'E's' clutch which had remained disengaged, was engaged and her engine put full astern. Approximately at the same time the said steamer 'Redwood,' fully and heavily loaded with passengers and cargo bound from Ketchikan to Bellingham, and whose fog signals had been previously heard as above stated, suddenly appeared through the fog on the 'Sun-d'E's' port bow not more than three hundred feet distant, moving at high speed, heading for the port side of the 'Sun-d'E,' and showing only her masthead light and foam on her bow, struck the 'Sun-d'E' on her port side just forward of the pilot house driving the 'Redwood's' stem deeply into the 'Sun-d'E's' deck and side, opening up a hole extending well below her water line, through which the 'Sun-d'E' immediately began to take water. The speed of the 'Redwood' was so great that she threw the 'Sun-d'E' over until the latter's starboard rail was under water, and pushed the 'Sun-d'E's' head around until she lay alongside the starboard side of the 'Redwood' and heading in the same direction, in which position she was made fast to the 'Redwood' under the direction of the latter's master and pilot. At this time the 'Sun-d'E' was in a sinking condition, and would have immediately sunk but for the lines by which she was made fast to the 'Redwood.' "

"Approximately an hour and one-half thereafter the 'Redwood,' with the 'Sun-d'E' lashed alongside, the latter's deck awash and filled with water, proceeded south-bound through the Channel, arriving off Warke Island about noon of said day and proceeded without stop to Jane Island, arriving there about 5:00 o'clock in the afternoon, and there made the 'Sun-d'E' further fast to the 'Redwood' by means of an additional line, and removed by hook from the stern of the 'Sun-d'E' 38 skates of fishing gear, made up, two dories, and certain other small items of fishing equipment. That thereafter the 'Redwood,' with the 'Sun-d'E' lashed alongside, proceeded into the waters of Milbank Sound. That while so proceeding in said Sound the lines making fast the 'Sun-d'E' to the 'Redwood' parted, upon which the 'Sun-d'E' sank and was wholly lost."

The court further found that the Redwood encountered fog at approximately 2:06 a. m., the fog continuing to the time of collision, and that the Redwood proceeded at full speed (nine knots per hour) until within one minute of the collision; that the Sun-d'E, from the time of entering the channel, was proceeding on that side of the channel which lay on her starboard side; that the vessels approached each other nearly head on, the Sun-d'E being slightly on the Redwood's port bow, the latter starboarding three minutes and hard astarboarding one minute before the collision; that neither at the time of collision nor at any time during at least twenty minutes prior thereto did the Redwood have a competent lookout; that the Redwood for at least an hour before the collision had been proceeding approximately in midchannel, sometimes on the port side and sometimes on the starboard side of the channel; that the master of the Redwood went off watch at 12 o'clock midnight, retired to his berth and remained there until the collision; that while proceeding in said fog, the Redwood was in command of a mate and pilot who remained seated on a stool before an open window on the bridge.

The court also found that the Sun-d'E was built in 1927 and was in good order and condition, fully equipped, provisioned, supplied, and outfitted for a halibut fishing voyage in Alaskan waters; that she had at the time of the collision a reasonable market value of at least $12,000. It was further found that certain supplies, provisions, and fishing gear aboard, of the reasonable market value of $2,294.25, were lost by the sinking of the Sun-d'E.

It was found, too, that the Redwood suffered no damage as a result of the collision; and that, had the Sun-d'E immediately after the collision been at a place where permanent repairs might have been effected, such repairs could have been made for $5,000, but there was no place of permanent repair nearer than Puget Sound, and towage was reasonably worth $500.

The seamen on the Sun-d'E had certain personal articles aboard the vessel with them in their quarters at the time of the collision. None of these articles were saved and the seamen assigned their claims to the libelant, Eriksen. The court found that the seamen had no opportunity to remove their personal effects after the impact and that all personal effects were lost and that they had a reasonable market value to each seaman, the total amount being $1,220.97.

Another point, which may be of importance, is that of the asserted request for

grounding of the Sun-d'E. The court found that: "After the 'Sun-d'E' was lashed alongside the 'Redwood' and the latter had proceeded with her down the channel, the master of the 'Redwood' said to the master of the 'Sun-d'E' that he would take the latter to the shallow and safe waters of Warke Island, and there ground her, which could have been done, but the libelant as owner and master of the 'Sun-d'E' requested that this not be done, and that the 'Redwood' attempt to tow the 'Sun-d'E' to Bellingham, whereupon the master of the 'Redwood' secured permission from the owners of the 'Redwood' by wireless and proceeded to do so, all at the special instance and request of libelant, as master and owner of the 'Sun-d'E,' who desired that the 'Sun-d'E' be not beached at Warke Island or elsewhere, but that the same be towed to Bellingham."

Decree was entered in favor of libelant in the sum of $5,761.64; in the sum of $1,046.13 for his seamen's effects; and for $156.64, costs.

The findings were made upon highly conflicting evidence; the parties being in agreement, if at all, only on a few minor points.

### The Appeal.

The appellant, Eriksen, contends that the loss of his vessel was due to the collision and that his vessel damages should have been its full value and not its estimated repair cost. This is his main point, although he also presents several other minor questions.

The findings of the court were made on conflicting evidence and the court found the Redwood solely at fault in the collision.

The evidence was all sharply conflicting, but there is no denying the fact that following the collision the Sun-d'E was lashed alongside of the Redwood and that the latter proceeded southbound through the channel with her tow. At about 5 o'clock the Redwood stopped in the channel, off Jane Island, made the Sun-d'E fast with additional line, and removed two dories and some gear from the after deck of the Sun-d'E. The Redwood and her tow then proceeded down the channel and into Milbank Sound, where, at about 11 o'clock p. m., the lashings parted and the Sun-d'E sank and was lost.

The court found, on conflicting evidence, that the master of the Redwood offered to take the Sun-d'E to the shallow and safe waters of Warke Island and there beach her, which could have been done, but that

the libelant urged that this be not done and requested that instead the Redwood attempt to tow the Sun-d'E to Bellingham, whereupon the master of the Redwood secured permission from the owners of the Redwood by wireless and proceeded to do so, "all at the special instance and request of libelant, as master and owner of the 'Sun-d'E,' who desired that the 'Sun-d'E' be not beached at Warke Island or elsewhere, but that the same be towed to Bellingham."

It was between the hours of 8 and 9 o'clock a. m., when Captain Jackson of the Redwood sent the wireless message to his owners asking permission to tow the injured vessel; it was about 11 o'clock a. m. when the answer granting permission was received; the Redwood arrived off Warke Island about noon; she was off Jane Island between five and six o'clock in the afternoon; and it was 11 o'clock p. m. when the Sun-d'E sank. To put the time differently, the wireless requesting permission to tow the Sun-d'E to Bellingham was sent at least five hours after the collision; the answer was received seven hours from the time of the collision; and Warke Island was passed one hour later.

These facts are quite important in considering appellant's principal argument, for Captain Eriksen's decision to try to tow his boat to Bellingham, rather than beach her, was not made "in extremis," but rather one made after calm and full reflection and reasoning. If the Sun-d'E could have been beached, which the court found, and Captain Eriksen, after mature judgment, elected to try to make Bellingham in tow, then he is not in a position to claim total loss and the resultant heavy damages.

The claim is made, and the cases so hold, that where the loss of the vessel is directly attributable to the collision, even though the injured vessel does not immediately sink, damages may be recovered for total loss. Taking this point as a premise, appellant insists that the sinking of the Sun-d'E was directly attributable to the collision, even though that boat did not sink until nineteen hours after the collision; the argument being that if his boat had not been rammed there would not have been a hole in her hull, and she would not have filled with water, and also because she would have sunk immediately if she had not been made fast to the Redwood.

The weakness of the argument lies in the disregard of the facts: The Sun-d'E did not sink immediately; she was still

afloat eighteen hours after the collision; she could have been beached and at least saved from becoming a total loss, had not her owner and master elected to be towed to Bellingham.

. Appellant contends that the courts hold "the loss of a vessel subsequent to a collision to be due to the collision, except where due efforts are not made to save her, or where the efforts made are so plainly wrong that they would have been rejected by any competent navigator placed in like circumstances." This rule is applicable where the circumstances require hasty decision and action "in extremis," but in the case before us the moment of confusion had passed, here was opportunity for calm, sober, and mature reflection, time to think things over, here was an offer to beach the vessel. "There was no such sudden emergency here which the law requires to exist, and which, when the court goes back to the original situation, indicates two courses, either of which, in the instant allowed for reflection, might seem fairly to indicate a step in avoidance of damage or danger. Here there was an appreciable time in which to carefully consider all the circumstances and they were exceedingly plain. If under such circumstances a careless act is excused on the ground that it was simply an error of judgment, in extremis, then every case of negligence could be excused on this exceptional ground, and negligence would be proved as evidence of prudence." The Silvia, 2 F. (2d) 99, 103 (D.C.N.Y.). In that case thirty minutes elapsed from the time of the injury until the mooring lines on the vessel were cut and she was allowed to drift away and later sink.

As a result of the sinking of the Sun-d'E she became an actual total loss, and on this basis the libel was framed.

To sustain his position the appellant at the trial testified that he knew it would be impossible to tow the Sun-d'E in her then condition across Milbank Sound. On the other hand, there was evidence that appellant requested the captain of the Redwood to tow his boat across the sound. The court found that such request was made and further that appellant having admitted that he knew it could not be done in the face of attendant dangers, he was precluded from claiming damages as for a total loss. His election was not to be excused on any theory that his judgment had been exercised under stress of an emergency. See The M. E. Luckenbach, 214 F. 571 (C.C.A. 2); Mc-

Donald et al. v. Hitchcock, Lloyd & Co., Inc., 17 F.(2d) 449, 450 (C.C.A. 3); The Mars, 9 F.(2d) 183 (D.C.N.Y.); 45 C.J. 962, § 517.

The question involved in The City of Macon (C.C.A.) 121 F. 686, cited by appellant, revolved around the judgment of the master of an injured vessel in a moment of emergency. There the steamship Teviotdale was stranded and, while stranded, was struck by the City of Macon and a small wound inflicted in her side, and the master was confronted with the problem of floating her with the tide and risking sinking or letting her remain on the sand bar and risking breaking up. The court said, at page 690 of 121 F.: "We have in the collision a natural and obvious cause for all the subsequent disasters which befell the Teviotdale." In The Magnolia, 16 Fed.Cas. 478, 482, No. 8,958, also cited by appellant, the court, in describing the situation surrounding the parties, said: "The circumstances of peril were then imminent, creating apprehension and confusion of mind," which is sufficient to distinguish that case as an authority for the loss of the vessel here involved.

The Walter A. Luckenbach, 14 F.(2d) 100 (C.C.A. 9), strongly relied upon by the appellant, likewise was a case of judgment "in extremis," which was not shown to be faulty. In that case the Lyman Stewart, the injured vessel, settled upon the rocks forty minutes after the collision, a very much shorter time between collision and sinking than in the case at bar. Furthermore, the Lyman Stewart was at the time in the grip of a strong ebb tide.

The court did not err in limiting libelant's recovery to the estimated repair cost at Puget Sound, plus $500 towage.

Appellant next contends that the court erred in allowing only the sum of $261.44 as damages for the loss of provisions, instead of the sum of $2,294.25, which included supplies and fishing equipment. He argues that all the items comprising the total sum asked were lost at the time of the collision and not nineteen hours later when the Sun-d'E finally went to the bottom. The holding of the District Court on this point is consistent with its holding on the loss of the vessel— that which was lost because of the collision was granted in damages; that which was lost through the subsequent sinking was not allowed. This ruling of the trial court accords with our views. Moreover, much gear was removed from the Sun-d'E after

the collision and transported to Bellingham and thence to Seattle, where it was receipted for by the appellant.

■■■ The appellant's next point is that, "Libelant's damages for personal effects should have been in the sum of $2,155.15, instead of $1,045.13," as found by the court. In this statement the former sum is made up of the total claims of the master and crew of eight for their lost personal effects, while the latter sum is the total of the amounts allowed by the court to the crew of eight. No damages for lost personal effects were allowed the master, Eriksen, by the court. Each of the seamen assigned his claim to Eriksen. Eriksen and each of his crew, save one, took the stand and outlined in some detail the personal effects each lost. In most instances the values placed upon the individual articles were fixed at the purchase price by the owners. One Dave Gross appeared as a witness for appellee and testified on the values of the articles lost. He was the proprietor of a men's new and used furnishings store catering especially to sailors and fishermen. His estimates of the value of the articles were, on the whole, slightly less than one-half the value placed upon the effects by the owners. The court's findings set the values at considerably lower than the owners, but higher than Gross, save in three instances, in one of which the court set the value lower and the same in the other two. Appellant claims that the questions put to witness Gross were not in proper form, in that as Gross was called upon as an expert his answers should have been made to hypothetical questions and not upon the testimony which he had heard given by the master and crew of the Sun-d'E. Counsel for the appellant objected to the witness answering and his objection was overruled. He cites Dexter v. Hall, 15 Wall. (82 U.S.) 9, 21 L.Ed. 73; Dunagan v. Appalachian Power Co., 33 F.(2d) 876, 68 A.L.R. 1393 (C.C.A. 4); and Manufacturers Acc. Ind. Co. v. Dorgan, 58 F. 945, 22 L.R. A. 620 (C.C.A. 6). All three were law cases, tried before juries, where the rules as to the admission and exclusion of testimony are much more strict than in admiralty. Moreover, as counsel for appellee points out, he offered to put the questions in hypothetical form, and the court stated, in effect, that such questioning would be unnecessary.

While we do not think that witness Gross' testimony was inadmissible, we are of opinion that even if it had been objection-able, no harm could have resulted for, where an action is tried to the court, it is always presumed that inadmissible evidence has been disregarded and only that which is admissible considered in arriving at judgment or decree. Furthermore, the court was not required to accept the values placed upon the articles by the owners, where such values were unreasonable and out of proportion to the real values at the time; it is not replacement values with which the court was concerned, but with actual value at the time of the collision. See The Minnie, 26 F. 860 (D.C.Conn.); Leonard et al. v. Whitwill, 19 F. 547 (D.C.N.Y.); The San Juan —S. C. T. Dodd, 1932 A.M.C. 289, 291–292 (D.C.Cal.).

■■■ It is further contended by appellant that the court erred in sustaining the exception to article VII of the amended libel, being libelant's claim for lost catch, or anticipated profits. As a result of the sinking of the Sun-d'E she became an actual total loss, and on this basis the libel was framed. Here her owner was not deprived of her use during the period of repairs for which remuneration is ordinarily awarded, but he was without any vessel and could have gone into the open market and purchased one.

The general rule is that: "In cases of total loss by collision damages are limited to the value of the vessel, with interest thereon, and the net freight pending at the time of the collision. The probable net profits of a charter may be considered in cases of delay occasioned by a partial loss, where the question is as to the value of the use of the vessel pending her repairs. In such cases the net profits of a charter, which she would have performed except for the delay may be treated as a basis for estimating the value of her use." The Umbria, 166 U.S. 404, 421, 17 S.Ct. 610, 617, 41 L.Ed. 1053. See The Hamilton (D.C.N.Y.) 95 F. 844, 845, where it is said that: "Where the ship is a total loss, compensation for the loss of use is not recoverable, for the precise reason that it is included in the recovery of the value, because there inheres in the sum recovered an earning power equivalent to the loss of use." Marsden's Collisions at Sea (8th Ed.), states the rule, at page 128, as follows: "A fishing smack recovered, besides the value of her nets and gear which she was obliged to cut adrift, the amount she might reasonably have expected to earn during the rest of the season * * *. But in a case where a trawler was sunk a

claim for the loss of fishing profits during the time it took to replace her was not allowed."

And 11 C.J. 1208, § 329, thus states the rule: "In case of total loss the owner cannot, in addition to the value of the vessel, recover the probable profits of a charter party which has been entered into but the performance of which has not been commenced, nor for the profits which would have accrued from the future use of the ship, even in the performance of an unexpired charter party," citing The Menominee (D.C.) 125 F. 530, 535, in which case it was said: "The result of the inquiry is that the attention of the court is called to no case where a vessel was lost by collision and there was an allowance of damages for the use of the vessel after her destruction, except for pending freight or for charter hire, which is in the nature of freight. Where the vessel was not regarded as a total loss, and compensation made therefor, demurrage according to the usual rule is allowed, and in the case of fishing vessels such demurrage or damages for detention have been ascertained by considering her probable net earnings in the enterprise to which she was devoted. * * * In the present case, however, the libelants demand to recover not only for the total loss of the vessel and all property lost or injured at the time, but also for her use or earnings during the immediate voyage in which she was engaged and the voyages which she might further make during the season thereafter. Such a rule would keep the vessel afloat after her destruction, and credit her with fish in the sea apprehended only in expectation."

The fact that the court allowed damages to the Sun-d'E on account of injuries occasioned by the collision only and not for total loss under the circumstances of this case does not change the rule above announced. Here, while full damages were awarded for the injuries inflicted by the Redwood, the court at the same time determined that the sinking of the ship was the fault of appellant and that therefore no recovery could be had for prospective profits.

Atchison, T. & S. F. R. Co. v. California Sea Products Company (C.C.A.) 51 F.(2d) 466, relied upon by appellant, was not a case of total loss, but merely delay caused by collision.

■ Appellant also claims that he was entitled to interest upon the amounts of his recovery. It appears that in cases of total loss by collision it is proper for a court to award interest upon the value of the vessel. The Umbria, supra. But in this case damages were not predicated upon total loss; they were based upon the expense of repair of the injury inflicted in the collision. Therefore, no error appears in the refusal of the court to allow interest from the date of the collision.

## The Cross-Appeal.

■ Most of the points made by cross-appellant Pacific American Fisheries are founded upon facts found by the court on conflicting evidence. As to these, it is the policy of appellate courts not to disturb such findings unless clearly contrary to or in utter disregard to the evidence. "As said by this court in The Mabel, 61 F.(2d) 537, 540: 'Even if we were inclined to differ with the learned trial judge who saw the witnesses, heard their testimony, and had opportunity of passing upon their credibility and accuracy, we would not be warranted in interfering with his findings of fact and conclusions, "unless the record discloses some plain error of fact, or unless there is a misapplication of some rule of law." ' (Citing cases.) No such error or misapplication appears in the record." The Bergen, 64 F.(2d) 877, 880 (C.C.A. 9). See, also, Siciliano v. California Sea Products Co., 44 F.(2d) 784, 785 (C.C.A. 9).

The contentions of cross-appellant that "the Sun-d'E was solely at fault for the collision"; that "the Sun-d'E was at fault in failing to keep to that side of the fairway or mid-channel which lay on her starboard side"; that "the Sun-d'E was at fault in failing to indicate that she had no way upon her * * *"; that "the Redwood was not proceeding at excessive speed and her speed was not a contributing factor to the collision"; that "the Redwood had a competent lookout"; and that "the District Court erred in finding that the cost of repairing the damage to the Sun-d'E was $5,000 and in allowing recovery therefor"—all fall within the rule above set forth.

■ The cross-appellant charges that "the Sun-d'E's lights were in accordance with the Inland Rules of Navigation and not in accordance with the International Rules, * * *," and cross-appellee admits this to be true. However, the court found that the Sun-d'E's lights were in place and brightly burning. Moreover, it affirmatively appears from the testimony that the noncompliance with the International Rules in this instance

could not possibly have caused the accident, for cross-appellant's witnesses saw the Sund'E when she was about half a mile away and any purpose served by the lights could not have aided more than an actual view of the vessel.

■ There is no merit in the claim that the court should not have allowed recovery for seamen's personal effects. This contention is made upon the theory that, as the seamen assigned their claims to libelant, Eriksen would be the one to profit thereby, and the court had declined to permit Eriksen recovery on his own personal effects. By the assignments Eriksen acquired all rights of the seamen in each of their claims regardless of his right to recover under his own personal claim.

There can be no recovery under the cross-libel because the Redwood was not injured by the collision, and therefore the trial court's action in dismissing the cross-libel of Pacific American Fisheries was correct.

Decree affirmed.